898 P.2d 1093

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Michael MEDLEY, Defendant–Appellant.**

No. 20174.

Supreme Court of Idaho,
Boise, February 1994 Term.

June 29, 1995.

Jonathan B. Hull, Kootenai County Public Defender, and Joel K. Ryan, Deputy Public Defender, Coeur d'Alene, for appellant. Joel K. Ryan argued.

Larry EchoHawk, Idaho Atty. Gen., Douglas A. Werth, Deputy Atty. Gen., Boise, for respondent. Douglas A. Werth argued.

TROUT, Justice.

Michael Medley appeals his conviction for the misdemeanor offenses of driving under the influence (DUI) and possession of a firearm while intoxicated, both entered upon conditional pleas of guilty. Specifically, Medley challenges the trial court's denial of his motion to suppress all evidence obtained by police when he was stopped at a Department of Fish and Game highway check station. Medley contends that the stop was unreasonable in violation of the United States and Idaho Constitutions.

## I.

### BACKGROUND AND PROCEDURAL HISTORY

On November 17, 1990, from 10:00 a.m. until 10:00 p.m., the Idaho Department of Fish and Game (the Department) set up a check station on U.S. Highway 95. This check station was pre-approved by the Department's regional supervisor and, by invitation of another Department official, officers from the Kootenai County Sheriff's Office, the United States Border Patrol, the United States Fish and Wildlife Service, the Kootenai County Law Enforcement Auxiliary, and the Kootenai County Interagency Drug Task Force participated in the operation.

The checkpoint was situated at a weigh station on the west side of U.S. Highway 95. The record reveals that only Department officers were involved in the actual stopping of vehicles. All southbound vehicles, with the exception of large trucks, emergency vehicles, and law enforcement vehicles, were stopped by a P.O.S.T. (Police Officers Standards and Training) certified Department conservation officer acting as flagperson. Signs were set up ahead of the check station to warn vehicles of the upcoming stop.

After the vehicles were stopped, the Department flagperson asked the drivers whether they had been fishing or hunting and whether they possessed any fish or game. If a driver answered affirmatively, the flagperson directed that driver to a spot in the weigh station parking lot for further inquiry. The flagperson also diverted persons with expired vehicle registration and persons suspected of driving under the influence, possession of drugs, or other offenses. Once parked, these drivers were questioned by another Department officer. If a violation not pertaining to fish and game was suspected, the Department officer was accompanied by a law enforcement officer. Vehicles that were not diverted from the main flow of traffic were only momentarily detained; vehicles that were diverted from the main flow were detained for a short time unless there was a violation.

At approximately 8:00 p.m., conservation officer Greg Johnson, acting as flagperson, waived Medley into the weigh station. Johnson testified that he observed Medley's truck approach faster than normal and that the truck did not slow down soon enough, actually going past the stop sign and triangle cone where Johnson was standing. On approaching the vehicle, Johnson detected the odor of

alcohol on Medley's breath and observed that Medley's eyes were red and watery. By radio, Johnson informed the Department officer in charge of the operation, Wayne Weseman, that Medley was possibly under the influence. He then directed Medley to the weigh station parking lot. Officer Weseman alerted law enforcement officers of the possibility that Medley was driving under the influence. Those officers apparently took charge at that point. Deputy Sheriff Gary Dagastine of the Kootenai County Sheriff's Office observed signs of intoxication and ultimately arrested Medley. Medley was charged with DUI, possession of marijuana, a weapons violation, and an open container violation.

Thereafter, Medley moved to suppress all evidence seized and observations made as a result of the check station stop, and to dismiss the charges against him, alleging that the initial stop was unlawful and without legal justification in violation of the United States and Idaho Constitutions. After a hearing and after reviewing the transcript of another case involving the same check station, the magistrate denied the motion. On December 24, 1991, Medley entered a conditional plea of guilty to the DUI and weapons violations and the State dismissed the other two charges. The magistrate entered judgments of conviction for driving under the influence and possession of a firearm while intoxicated based on Medley's conditional pleas. The district court upheld the magistrate's ruling and this appeal followed.

## II.

### STANDARD OF REVIEW

In reviewing an order granting or denying a motion to suppress evidence, an appellate court will defer to the trial court's factual findings unless the findings are clearly erroneous. However, free review is exercised over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found.

*State v. Weber*, 116 Idaho 449, 451–52, 776 P.2d 458, 460–61 (1989). Further, when an appeal is initially taken to the district court, any subsequent review will be conducted independent of, but with due regard for, the decision of the district court. *Smith v. Smith*, 124 Idaho 431, 436, 860 P.2d 634, 639 (1993) (citing *McNelis v. McNelis*, 119 Idaho 349, 806 P.2d 442 (1991)).

## III.

### THE SEIZURE THAT OCCURRED IN THIS CASE WAS UNREASONABLE IN VIOLATION OF THE UNITED STATES CONSTITUTION

The issue before this Court is whether the magistrate properly denied Medley's motion to suppress based on his determination that the initial stop did not violate Medley's constitutional right to be free from unreasonable searches and seizures. We hold that there was a violation under the United States Constitution. Therefore, we reverse the denial of the motion to suppress.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures conducted by government officials.[1] The essential purpose of this prohibition is to safeguard the privacy and security of individuals against arbitrary invasions conducted solely at the unfettered discretion of government officials. *E.g., Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). However, the prohibition is not absolute and applies only to those searches and seizures which are found to be unreasonable. *E.g., Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960).

When a vehicle is stopped at a checkpoint by law enforcement officials, a "seizure" within the meaning of the Fourth Amendment has occurred. If such a seizure is not made pursuant to a warrant, probable cause, or one of the well-recognized excep-

1. The Fourth Amendment provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

tions to the probable cause rule, a balancing test is used to determine its reasonableness. *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). This test was most clearly articulated by the United States Supreme Court in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

> Consideration of the constitutionality of such seizures involves a weighing of [1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.
>
> . . . .
>
> A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.

*Id.* at 50–51, 99 S.Ct. at 2640 (citations omitted). Accordingly, we will identify and balance these three elements in light of the fear of arbitrary invasions conducted at the unfettered discretion of law enforcement officers.

## A. The State's Interest

The State has a compelling interest in the management and conservation of its natural resources, including wildlife. This interest is of such importance that the legislature has asserted pervasive control over it. *See* I.C. § 36–103. Moreover, we note that the legislature has provided statutory authority supporting the use of check stations maintained by the Department for the purpose of checking fish and game licenses and lawful possession of wildlife. I.C. § 36–1201. While this does not end our inquiry, it is a strong indication of the legislature's perception that fish and game violations are matters of grave public concern which justify minimal intrusion into the public's right of privacy.

## B. The Severity of Interference With Individual Liberty

With regard to the individual interest implicated in this case, there is clearly an interest in unrestrained travel on public roadways. Although, the intrusion on that interest that actually occurred in this instance was minimal, the manner in which the checkpoint was carried out did create the potential for a greater degree of intrusion. Intrusion is measured from both an objective and a subjective standpoint. *See, e.g., Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083. Objective intrusion is measured by the duration of the seizure and the intensity of the investigation. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 451–52, 110 S.Ct. 2481, 2486, 110 L.Ed.2d 412 (1990). In this case, the objective intrusion resulting from the check station was slight. Vehicles not diverted from the main flow of traffic were only momentarily detained; vehicles that were diverted were detained for a short time unless a violation was found.

Subjective intrusion is measured by the potential for generating fear and surprise on the part of lawful travelers. *Id.* The level of subjective intrusion flowing from the actual stop in this case appears to have been minimal. The stop was systematic; all vehicles other than large commercial trucks and emergency and law enforcement vehicles were stopped. Safety precautions were taken and there were warning signs in advance. However, the Kootenai County Sheriff's Office set up a roving patrol to prohibit people from avoiding the check station by using alternative routes. This type of patrol could cause concern or fright on the part of lawful travelers. *See Id.* at 453, 110 S.Ct. at 2486–87 (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)).

## C. The Degree to Which the Seizure Advances the State's Interest

The critical element in this case is the degree to which the seizure advances the public's interest in the conservation and management of wildlife resources. *Routine* fish and game check stations are indeed an effective method for advancing this interest. The area covered in this case was large and remote and the number of enforcement officers limited. Requiring conservation officers, under these circumstances, to have probable cause before stopping suspected violators

would be an enormous burden. Further, the checkpoint was set up on a date which would encompass both fishing and hunting seasons and at a time when both fishermen and hunters would be returning to their homes. The station was located on a highway leading from potential hunting areas and was set up where there was adequate room for vehicles to pull off the highway safely and without much delay.[2]

However, the checkpoint at issue in this case was hardly a *routine* fish and game check station. Although it was established by the Department of Fish and Game, the officer in charge of the operation issued a blanket invitation to any additional law enforcement agency that wished to participate so that violations of laws not pertaining to fish and game could be detected and dealt with. The record reveals that a large number of other agencies readily accepted this invitation and played an active role in the operation. The record also reflects that in many instances where vehicles were diverted for fish and game purposes, once Department officers had completed their inquiry, law enforcement officers conducted their own inquiry as to violations unrelated to fish and game. Because of this, it appears that the government officials involved did not intend the check station operation to be confined to the advancement of the State's interest in the conservation of wildlife.

### D. Balancing

■■■■■ The overriding concern in the application of the *Brown* test is the nature and extent of the discretion wielded by law enforcement officers in the field. *Brown* at 50–51, 99 S.Ct. at 2640. We note that the legislature has provided statutory authority supporting the use of routine Department

check stations, I.C. § 36–1201, and that such operations are apparently conducted pursuant to established Department policy.[3] However, there is no statutory authorization for a "dragnet" checkpoint, such as that conducted here, where all passersby are stopped and screened for any conceivable violation. Furthermore, Department officials admit that there was no specific Department policy or other neutral criteria in place governing the procedure to be followed in the event a person stopped appeared intoxicated. Rather, the Department relied on the discretion of the officers operating the station to act as "reasonable officers." This is precisely the type of unfettered discretion which the Fourth Amendment to the United States Constitution was designed to prevent. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 662–63, 99 S.Ct. 1391, 1400–01, 59 L.Ed.2d 660 (1979). In balancing the three factors identified above, we conclude that the Department checkpoint, as conducted in this case, resulted in an unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

### IV.

### WE NEED NOT DETERMINE WHETHER THE IDAHO CONSTITUTION PROVIDES GREATER PROTECTION IN THIS CASE

We have recognized that "in interpreting provisions of our constitution that are similar to those of the federal constitution we are free to extend protections under our constitution *beyond* those granted ... under the federal constitution." *State v. Thompson*, 114 Idaho 746, 748, 760 P.2d 1162, 1164 (1988) (emphasis added). However, where the State has violated the minimum require-

---

2. In applying the "advancement of the public interest" element of the *Brown* test, we will not second-guess reasonable determinations by law enforcement officials regarding which enforcement techniques are appropriate to address a specific public issue. We emphasize that "the choice among ... reasonable alternatives remains with the government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of [law enforcement] officers." *Sitz* at 453–54, 110 S.Ct. at 2487.

3. Legislative authorization is not a free-standing constitutional requirement for a reasonable seizure since such authorization cannot save an otherwise unconstitutional seizure. Rather, the existence of legislative authorization is an element to be considered in determining whether the officials conducting the checkpoint are exercising unfettered discretion. Moreover, a warrantless seizure is, by definition, one that is not made pursuant to prior judicial authorization. Thus, prior judicial authorization is likewise not a prerequisite to a finding of constitutionality.

ments imposed by the federal constitution, any such extension by this Court would be *obiter dicta*. In *State v. Henderson*, 114 Idaho 293, 756 P.2d 1057 (1988), we expressed no view as to whether fish and game roadblocks complied with state constitutional requirements. *Id.* at 299 n. 4, 756 P.2d at 1063 n. 4. Because we conclude that the stop in this case violated the minimum protections mandated by the federal constitution, we do not determine whether it also violated Idaho Const. art. 1, § 17, and whether that provision provides greater protection than its federal counterpart since such a determination would be unnecessary to the resolution of this appeal.

## V.

## CONCLUSION

The magistrate's denial of Medley's motion to suppress and Medley's judgment of conviction are reversed.

McDEVITT, C.J., JOHNSON and SILAK, JJ., and WALTERS, Justice Pro Tem, concur.