943 P.2d 52

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Corey WEBB, Defendant–Appellant.**

**No. 23091.**

Supreme Court of Idaho.

Boise, May 1997 Term.

July 25, 1997.

Michael F. Donovan, Ketchum, for appellant.

Alan G. Lance, Attorney General; Catherine O. Derden, Deputy Attorney General, (argued), Boise, for respondent.

SILAK, Justice

This is an appeal from a denial of a motion to suppress marijuana evidence taken from appellant's real property without a search warrant. We affirm.

## I.

## FACTS AND PROCEDURAL BACKGROUND

This case involves issues related to a search and seizure at appellant Corey Webb's (Webb) real property in Gooding County, Idaho. Webb's property consists of a 20 acre parcel of rural land outside the Hagerman city limits. A fence line surrounded the entire 20 acres. The fence consisted of wooden posts with barbed wire strung between the posts; however, the fence was in poor condition. At many places along the fence line one could simply step

over the fence wires lying on the ground. As of July 1995, Webb had put up new metal posts on two sides of the property, but he had still not strung wire on the posts.

Located on the southeast corner of the property was a well house, shop and trailer. Access to the shop and trailer was achieved by a driveway. A gate and a "no trespassing" sign were located by the road entrance to the trailer house. This was the only "no trespassing" sign located on the 20 acre parcel or around the perimeter of the property. There was a thick grove of Russian olive trees running along the entire eastern border of the property. Also running along the eastern border was a dirt berm, which obstructed the view of the property from the road.

A drainage ditch carrying run-off irrigation water from farms located south of the property entered the property at the southeast corner and angled in a northwesterly direction across the property to the north boundary. The ditch ran to the northeast of the area where the shop and trailer were located. A path led from the shop across the ditch and into the north edge of the marijuana garden. Both sides of the ditch were surrounded by Russian olive trees. Also located along the ditch was a small waterfall Webb created by damming part of the ditch, which Webb referred to as a "Zen garden" and which he used for meditation. The Zen garden and the marijuana garden were on opposite sides of the ditch.

In November 1993, Special Agent Jim Hopkins (Hopkins) of the Idaho Bureau of Narcotics, received an anonymous tip from someone claiming that he had come upon what he believed to be the remains of an old marijuana garden. From a description of the location, Hopkins and Gooding County Sheriff Jax drove to the property and entered it from the west. Although there were some fence posts in this area there was no wire on the posts. The officers then came to a site where they determined that marijuana had previously grown. There they saw plastic tubing, rigged irrigation tubing, old stalks of marijuana and buckets. The officers photographed the area and later determined from property records that the owner was Webb. At that time, Webb was not living on the property. The officers planned to return to the site the next spring during growing season.

In June 1994, Hopkins visited the property again with his supervisor. At this time Webb was still not living on the property. Entry was again from the west and the fence was in the same condition. The two observed marijuana growing in the same location. The officers were going to set up surveillance cameras at the grow site, but when they returned in August the marijuana had already been harvested. The officers planned to wait until the next year to return.

In July 1995, the Twin Falls County Sheriff's Office and the Gooding County Sheriff's Office set up a marijuana detection operation to check various suspected grow sites in the area, including Webb's property. On July 24, 1995, after flying over Webb's property in a National Guard helicopter and taking aerial photographs, Special Agent Robinson identified a marijuana garden growing among some olive trees on Webb's property. Later that day, all of the investigating officers met back at the Gooding Airport where it was decided that several officers would set up surveillance of the grow area, while other officers would meet with the prosecutor to discuss obtaining a search warrant. Webb had moved onto the property in May 1995.

The officers who returned to the property to set up surveillance drove down the county road that bordered the eastern side of Webb's property, walked up the berm, stepped over an old barbed wire fence which was lying on the ground in some places, and walked through some brush and olive trees adjacent to the road. As they entered the property from the county road, they could smell the distinct odor of growing marijuana. As the officers set up the surveillance of the garden, Webb entered the garden and proceeded to walk through the rows of marijuana plants, at which time he was arrested. The officers discovered a marijuana garden of 73 plants in an area of approximately 25 feet by 50 feet surrounded by Russian olive trees.

Webb was charged with trafficking in marijuana and manufacturing a controlled substance. Webb moved to suppress the evidence of marijuana which was denied. Webb thereafter entered a conditional plea of guilty to manufacturing a controlled substance, reserving his right to appeal the denial of his motion to suppress, and the State dismissed the trafficking charge. The district court imposed a unified sentence of five years with all five years fixed, but retained jurisdiction for 180 days. Execution of the sentence was stayed pending appeal. Webb appeals.

## II.

### ISSUES ON APPEAL

1. Whether the district court correctly found that the marijuana was not located within the curtilage of Webb's property for purposes of the Fourth Amendment to the United States Constitution.

2. Whether the district court correctly found that the marijuana was not located within the curtilage of Webb's property for purposes of art. I, § 17 of the Idaho Constitution.

3. Whether the district court correctly concluded that because the marijuana garden was not within the curtilage of Webb's property and was thus located in an open field, the search and seizure of the marijuana was constitutionally permissible under both the Idaho and United States Constitutions.

## III.

### ANALYSIS

#### A. Standard Of Review.

■ When this Court reviews an order granting or denying a motion to suppress evidence, it defers to the trial court's factual findings unless the findings are clearly erroneous. However, the Court exercises free review over the trial court's determination as to whether constitutional requirements have been met in light of the facts found. *State v. Medley*, 127 Idaho 182, 185, 898 P.2d 1093, 1096 (1995); *State v. Weber*, 116 Idaho 449, 451–52, 776 P.2d 458, 460–61 (1989).

#### B. The District Court Correctly Found That The Marijuana Was Not Located Within The Curtilage Of Webb's Property For Purposes Of The Fourth Amendment To The United States Constitution.

■ The Fourth Amendment to the United States Constitution preserves "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ..." This provision is designed to protect a person's expectation of privacy which society is prepared to recognize as reasonable. *Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984). In this regard, a warrantless search is *per se* unreasonable under the Fourth Amendment, subject to a few well established exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

The United States Supreme Court has extended the Fourth Amendment's protection of a home against unreasonable searches and seizures to the curtilage. In *Oliver v. United States, supra*, the Court distinguished "open fields" from "curtilage," the land immediately surrounding and associated with the home, stating that the distinction "implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home." 466 U.S. at 180, 104 S.Ct. at 1742. The Court noted that at common law, curtilage was "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.*, (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). The Court held that the extent of the curtilage is determined by certain factors which bear upon whether a person reasonably may expect that the area in question should be treated as the home itself. *Id.* at 180, 104 S.Ct. at 1742.

In *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Supreme Court set forth four factors to be considered in determining whether an area surrounding a home comes within the definition of curtilage for Fourth Amendment purposes. These factors are: (1) the proximity to the home of the area claimed to be curti-

lage; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from the observation of people passing by. 480 U.S. at 301, 107 S.Ct. at 1139–40. The Court stated that it was not creating a bright-line rule or "finely tuned formula," but rather providing "useful analytical tools" with which to decide the central question of whether the area "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

In *Dunn*, the evidence (chemicals used to make controlled substances), was seized from a barn on a 198–acre ranch near Johnson City, Texas. The ranch was completely encircled by a perimeter fence and contained several interior barbed wire fences. The ranch residence was situated 1/2 mile from a public road. A fence encircled the residence and a nearby greenhouse. Two barns were located approximately 50 yards from the fence. The front of the barn where the evidence was seized was enclosed by a wooden fence. *Id.* at 297, 107 S.Ct. at 1137–38.

The officers in *Dunn* made a warrantless entry onto the property crossing over the perimeter fence and one interior fence. When the officers stood midway between the residence and the barns, the officers smelled what they believed was phenylacetic acid coming from one of the barns. The officers proceeded to the barn, crossing another barbed wire fence as well as the wooden fence that enclosed the front of the barn. Shining a flashlight into the barn, the officers observed what they thought was a phenylacetone laboratory. *Id.* at 297–98, 107 S.Ct. at 1137–38.

The Supreme Court utilized the four factors in holding that the barn was not within the curtilage. First, the Court noted that the barn was 50 yards, or 150 feet, from the fence surrounding the house and 60 yards from the house itself. The Court concluded that the barn stood in isolation and that this substantial distance supported no inference that the barn should be treated as curtilage. Second, the Court found it significant that Dunn's barn did not lie within the area surrounding the house that was enclosed by a fence. The Court held that the fence plainly demarked a specific area of land immediately adjacent to the house that was readily identifiable as part and parcel of the house. Conversely, the Court found that the barn, the front portion of which was enclosed by a fence, and the area immediately surrounding it, stood out as a distinct part of the ranch, separate from the residence. Third, the Court found it especially significant that the officers possessed objective data (aerial photographs) indicating that the barn was not being used for intimate activities of the home. Fourth, the Court found that Dunn did little to protect the barn area from observation by those standing in the open fields, and that the fences were designed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas. *Id.* at 302–03, 107 S.Ct. at 1140–41.

■ In the present case, the district court, relying on *Dunn* and its four factors, ruled that the marijuana garden was not within the curtilage of Webb's home. With respect to the proximity factor, the court found that the garden was located 230 feet from Webb's trailer and 150 feet from his shop. The court stated that based upon these measurements it could not find that the garden area was located within the area immediately surrounding the residence. The court further found that the aerial photographs showed that the marijuana was deliberately located outside of the curtilage. The crop was completely surrounded by Russian olive trees so that it could not be seen from the trailer or shop. While the court acknowledged that there is no set distance for defining what area is within the curtilage, compared to distances discussed by other courts, including *Dunn*, the court stated that 230 feet did not compel a finding that the garden was located within the curtilage.

With respect to whether the area was included within an enclosure surrounding the home, the district court found that the only enclosure surrounding Webb's trailer or shop was the barbed wire fence which was in total disrepair surrounding the twenty acre parcel. The court again stated that the aerial photographs of the property clearly showed that the garden was segregated or dissociated from the trailer and shop area.

With respect to the third factor, *i.e.*, the uses to which the area is put, Webb testified

that he had created a "Zen garden" near the marijuana where he meditated every day. The district court found that other than Webb's testimony, there was no objective data to suggest that the area was being used for meditation.

With respect to the steps taken by Webb to protect the area from observation, the district court found that although the berm and olive trees did protect the garden area from view outside of the perimeter and boundaries of the property, the garden area could be seen and smelled from other areas of the property that were indisputably outside of the curtilage.

Based upon the foregoing, we hold that the district court's findings that the marijuana garden was not within the curtilage for purposes of the United States Constitution are not clearly erroneous. The significant distance between the garden and the trailer and shop, and the fact that the garden was very segregated from the rest of the property, support a finding that the garden is not an area immediately adjacent to the home such that Webb could reasonably expect that this area should be treated as the home itself. Further, although Webb testified that he purchased the property for its secluded nature, the berm and olive trees are natural borders and not evidence of steps taken by Webb to protect the area from view. Webb also did not make much of an attempt to keep trespassers off of his property by repairing the broken-down fence or posting more than one "no trespassing" sign. It should further be noted that the first two times the officers investigated the marijuana garden, in 1993 and 1994, Webb was living in Ketchum, not on the property. Thus, we do not believe that Webb had a reasonable expectation of privacy, and therefore affirm the district court's ruling with respect to the Fourth Amendment.

C. **The District Court Correctly Found That The Marijuana Was Not Located Within The Curtilage Of Webb's Property For Purposes Of Art. I, § 17 Of The Idaho Constitution.**

Webb argues that the Idaho Constitution provides greater protection to individual privacy and property rights than does the United States Constitution. It is well-settled that when interpreting the Idaho Constitution, this Court is free to confer broader protection to Idaho citizens than that provided by the United States Constitution. *State v. Guzman*, 122 Idaho 981, 987, 842 P.2d 660, 666 (1992). The definition of curtilage expressed by the United States Supreme Court in *Dunn* may not adequately reflect the scope of the privacy interest protected by art. I, § 17 of the Idaho Constitution. We conclude that the following analysis of curtilage better serves the citizens of Idaho in view of the rural nature of much of our state.

When determining whether an area comes within the curtilage of a defendant's residence, the trial court must first consider the four factors set forth in *Dunn*. By so holding we do not suggest that the factors are to be rigidly applied, but rather, are to be used as "useful analytical tools". *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139–40.

Secondly, we hold that when the trial court assesses the curtilage boundaries, in addition to considering the *Dunn* factors, the court should apply them in the context of the setting or locality of the residence itself. For instance, the curtilage of a home located within the city limits of Boise may not be the same as the curtilage of a ranch located in one of Idaho's rural counties. The trial court must therefore take into consideration the differences in custom and terrain within different areas of the state when contemplating particular expectations of privacy. *See, e.g., State v. Sutton*, 112 N.M. 449, 816 P.2d 518, 524 (Ct.App.1991) (overruled in part on other grounds) ("In New Mexico, lot sizes in rural areas are often large, and land is still plentiful. Our interpretation and application of the state constitution must take into account the possibility that such differences in custom and terrain gave rise to particular expectations of privacy when the state constitution was adopted.") We believe that this formulation of curtilage will better ensure that Idaho citizens' reasonable expectations of privacy will be met.

In the present case, we remain unpersuaded, even under this broader test, that the marijuana garden was within the curtilage of Webb's home. The garden was located a significant distance from either the trailer or the shop, and rather than being included in an enclosure around the home, the garden was deliberately segregated from the home and hidden from view by surrounding Russian olive trees. The only enclosure around the home was a broken down fence encompassing the entire twenty acre tract, portions of which were lying on the ground. Further, there was only one "no trespassing" sign on the entire property and that was at the driveway entrance to the trailer. No other attempts were made by Webb to indicate to the rest of the world that he had an expectation of privacy concerning the marijuana garden. In fact, the police were originally informed of the marijuana by a hunter who had wandered onto the property. When the officers entered the property for the third time (the time in which Webb had actually moved onto the property, and after the aerial photographs showed the marijuana), the officers drove on a county road on the eastern border, walked up a natural berm, stepped over a dilapidated fence lying on the ground and walked through some olive trees to see and smell the garden. Thus, we hold that, applying all four factors of *Dunn*, even when giving further consideration to the rural location and setting of Webb's property, the marijuana garden was not within the protected curtilage of Webb's home pursuant to art. I, § 17 of the Idaho Constitution.

**D. Because The Marijuana Garden Was Not Within The Curtilage Of Webb's Property And Thus Was Located In An Open Field, The District Court Correctly Ruled That The Search And Seizure Of The Marijuana Was Constitutionally Permissible Under Both The United States and Idaho Constitutions.**

Because we hold that the marijuana garden was not within the curtilage of Webb's property under either the United States or Idaho Constitutions, we conclude that the garden was in an open field and thus subject to a warrantless search. In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court discussed when a person may have a reasonable expectation of privacy. In reaffirming *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Court stated that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." 466 U.S. at 178, 104 S.Ct. at 1741. The Court explained:

> In contrast [to curtilage], open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields.

*Id.* at 179, 104 S.Ct. at 1741.[1] The Court thus concluded that a person has no legitimate expectation that an open field will remain free from government intrusion. *Id.* at 181, 104 S.Ct. at 1742–43. We hold that Webb therefore had no legitimate expectation of privacy with respect to the marijuana garden.

## IV.

### CONCLUSION

We hold that the district court correctly concluded that the marijuana garden was not within the protected curtilage of Webb's home under either the Fourth Amendment to the United States Constitution or art. I, § 17 of the Idaho Constitution.

We further hold that because the garden was not within the curtilage of Webb's home, the garden lay within an "open field" which is not subject to constitutional protection.

Accordingly, the order of the district court denying the motion to suppress marijuana

---

1. The Court also noted that the public and police may lawfully survey lands from the air which was the case here.

.

evidence acquired during a warrantless search is affirmed.

TROUT, C.J., and JOHNSON, McDEVITT and SCHROEDER, JJ., concur.