996 P.2d 309

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Raymond T. THURMAN, Defendant–Appellant.**

No. 25356.

Court of Appeals of Idaho.

Dec. 21, 1999.

Rehearing Denied Jan. 25, 2000.

White, Peterson, Pruss, Morrow & Gigray, P.A., for Appellant. D. Sam Johnson argued.

Alan G. Lance, Attorney General; Alison A. Stieglitz, Deputy Attorney General, Boise, for Respondent. Alison A. Stieglitz argued.

SCHWARTZMAN, Judge.

Raymond T. Thurman conditionally pled guilty to one count of unlawful possession of a mule deer doe and one count of unlawful possession of a mule deer fawn, I.C. § 36–502, after his motion to suppress the evidence was denied by the magistrate. Thurman appealed to the district court, which affirmed the magistrate's decision. Thurman again appeals, asserting that his right to be free from unlawful intrusions was infringed, in violation of both the United States and Idaho Constitutions, by an Idaho Department of Fish and Game (IDFG) officer who stopped him at an impromptu checkpoint.

Thurman claims that: (1) the officer lacked the authority to conduct the check station in the manner it was conducted; (2) the officer did not have an individualized reasonable suspicion that Thurman had violated a fish and game regulation before he was stopped; and (3) on the facts of this case, Thurman's interest in individual liberty outweighs the public's interest in managing its wildlife. We affirm the magistrate's denial of Thurman's motion to suppress.

## I.

### FACTS AND PROCEDURE

IDFG Officer Jeff Day set up a fish and game check station on a straight stretch of rural gravel road in Owyhee County on October 29, 1997, after receiving authorization from his supervisor. The check station was located in Unit 40, approximately two miles from the town of Oreana and eight miles from Highway 78. At this time, a two point or less mule deer hunt was open in Unit 40, and the chosen road was frequently traveled by hunters and ranchers. Officer Day felt that this position would give him the best opportunity to encounter both legal and illegal hunters.[1]

---

1. Officer Day testified that this was traditionally a high violation area and that on the day before the season opened he apprehended a poacher in this area.

Officer Day set up a reflective caution sign about one hundred yards before the stopping area that read "Caution—Idaho Fish and Game Check Station Ahead." At the stopping area itself, he set up another reflective sign that simply read "Stop." Officer Day set up the check station at 2:30 p.m. and operated it by himself until approximately 8:00 p.m. He chose these times because it was when more hunters would likely be encountered. He stopped all sixteen vehicles that passed the check station during this timeframe. Officer Day encountered thirty people at his check station, sixteen of which were hunters. Officer Day asked the same two questions of every passerby: (1) Are you hunting today? and (2) Are you transporting any fish or game?

Thurman approached the check station at approximately 7:50 p.m., after the sun had gone down. Officer Day, in uniform, turned on his blue overhead light and stepped out of his truck. The reflective Idaho Department of Fish and Game door emblem was visible to oncoming traffic because his truck was parked perpendicular to the road. Thurman sped up as he drove by the check station and came close to hitting Officer Day. Officer Day got back in his truck and pursued Thurman, with his blue overhead light flashing, for about a mile before Thurman stopped.

Thurman exited his truck and quickly walked back toward Officer Day. When asked if he saw the check station, Thurman simply responded, "I'm sorry." Thurman was asked the same questions Officer Day had asked of every other passerby. Thurman responded that he had not been hunting and did not have any fish or game in his possession. However, Officer Day noticed what appeared to be blood on Thurman's pants and asked Thurman if he could look in his camper, to which Thurman responded, "yes."

Thurman insisted he had been rock collecting, but inside the camper Officer Day found a mule deer doe under a tarp. Officer Day wrote Thurman a citation for possession of the illegally taken doe and failure to stop at the check station and began to remove the doe from Thurman's camper. He subse-

quently found a mule deer fawn and issued Thurman another citation.

Thurman thereafter filed a motion to suppress the evidence discovered at the check station stop. At the suppression hearing, Officer Day testified to the above matters. Thurman argued that the stop conducted by Officer Day violated his Fourth Amendment rights under the United States Constitution and his counterpart rights under Article I, § 17 of the Idaho Constitution. The magistrate denied Thurman's motion to suppress, ruling that Officer Day's check station was a routine check station permitted by I.C. § 36–1201(b) and was proper. Thurman filed a motion to reconsider, which was denied after a hearing. Thurman then entered conditional pleas of guilty to the unlawful possession of a mule deer doe and fawn charges, in exchange for the state's agreement to dismiss the charge of failing to stop at an IDFG check station.

Thurman appealed the denial of his motion to suppress to the district court, which affirmed the magistrate. Thurman now appeals to this Court.

## II.

## THE MAGISTRATE CORRECTLY DENIED THURMAN'S MOTION TO SUPPRESS

### A. Standard Of Review

When this Court reviews an intermediate appellate decision of the district court, we examine the record that was before the magistrate. We will review the district court's decision and order for any useful insights; however our focus is on the magistrate's decision and the record upon which it was based. *State v. Doe,* 130 Idaho 811, 814, 948 P.2d 166, 169 (Ct.App.1997), *citing State v. Carr,* 128 Idaho 181, 183, 911 P.2d 774, 776 (Ct.App.1995); *State v. Hardman,* 120 Idaho 667, 668, 818 P.2d 782, 783 (Ct.App.1991). We review the record independently, giving due regard to the decision of the district court. *State v. Thompson,* 130 Idaho 819, 821, 948 P.2d 174, 176 (Ct.App.1997), *citing State v. Bitt,* 118 Idaho 584, 585 n. 1, 798 P.2d 43, 44 n. 1 (1990); *State v. Van Sickle,*

120 Idaho 99, 101, 813 P.2d 910, 912 (Ct.App. 1991).

■ When we review a magistrate decision denying a motion to suppress, we defer to the findings of fact unless they are not supported by substantial and competent evidence in the record. *State v. DuValt*, 131 Idaho 550, 552–52, 961 P.2d 641, 643–44 (1998). However, we freely review the magistrate's determination of whether constitutional requirements were met in light of all the facts. *Id.; State v. McAfee*, 116 Idaho 1007, 1008, 783 P.2d 874, 875 (Ct.App.1989).

## B. The Check Station Was Statutorily Authorized Under I.C. 36–103(b) And I.C. § 36–1201(b)

■ The Idaho legislature has provided statutory authority to the Idaho Department of Fish and Game to conduct routine check stations.[2] I.C. § 36–103(b); I.C. § 36–1201(b). In addition to and pursuant to this statutory authority, the IDFG has adopted internal policy guidelines for the establishment of impromptu check stations. These guidelines list their objectives as: (1) to collect fish and game management information; (2) to make personal contact and provide information to large numbers of the fishing and hunting public; and (3) to apprehend fish and game violators and deter violations by providing information and through the psychological effect of frequent checks at various locations. The guidelines require an officer to get prior authorization before setting up a check station. Impromptu check stations set up on gravel or dirt roads "must be established at a point on the roadway clearly visible at a distance of not less than 100 yards in either direction"; have "a sign or signs ... placed on the roadway displaying the word "stop" in letters of sufficient size and luminosity to be readable at a distance of not less than fifty yards either in daytime or darkness"; and must have "at least one (1) blue light ... at the side of the roadway which shall be flashing." Officer Day's impromptu check station complied with the above guidelines.[3] As stated previously, Officer Day set up the check station on a straight stretch of roadway and placed a reflective sign one hundred yards from the stopping area indicating to motorists that an IDFG check station lay ahead. He also placed a clearly visible, reflective "stop" sign just before the stopping area and had his blue overhead light flashing. Officer Day was in full uniform and parked his truck perpendicular to the roadway, displaying the reflective IDFG emblem affixed to the truck's door.

---

2. Idaho Code section 36–103(b) provides that:
   [b]ecause conditions are changing and in changing affect preservation, protection, and perpetuation of Idaho wildlife, *the methods and means of administering and carrying out the state's policy must be flexible* and dependent on the ascertainment of facts which from time to time exist and fix the needs for regulation and control of fishing, hunting, trapping, and other activity relating to wildlife, and because it is inconvenient and impractical for the legislature of the state of Idaho to administer such policy, it shall be the authority, power and duty of the fish and game commission to administer and carry out the policy of the state in accordance with the provisions of the Idaho fish and game code. The commission is not authorized to change such policy but only to administer it. (emphasis added).
   Idaho Code § 36–1201(b) provides:
   No fisherman, hunter or trapper shall refuse or fail to stop and report at a wildlife check station encountered on his route of travel when directed to do so by personnel on duty. Such direction may be accomplished by signs prominently displayed along the route of travel indicating those persons required to stop.

3. We are unable to ascertain whether Officer Day complied with all of the other applicable IDFG guidelines because there is no evidence in the record on this matter. However, even if there existed proof that Officer Day did not fully comply with all internal guidelines, such fact alone would not support a conclusion that the stop was unconstitutional. It is only pertinent to our inquiry that Officer Day acted reasonably and without any significant exercise of individual discretion. *State v. Sherburne*, 571 A.2d 1181, 1185 (Me.1990) (holding that even though game wardens failed to comply with their own department's policy directive on checkpoints, the checkpoint was nonetheless conducted reasonably and therefore was constitutional); *Drane v. State*, 493 So.2d 294, 296 (Miss.1986) (rejecting arguments that the absence of any departmental guidelines for fish and game checkpoints made them consist of "standardless and unconstrained discretion"); *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423, 430 (1980) (holding that a fish and game roadblock was conducted reasonably although the record "was barren of reference to regulations or policies of the Game Commission").

The impromptu check station guidelines additionally provide that "no check stations will be established and operated in a manner that will detain non-hunters or non-fishermen unnecessarily. Generally, anything other than quickly determining whether the vehicle occupants have been hunting or fishing could be considered unnecessary delay." This is precisely what Officer Day did on the day in question—quickly determine if vehicle occupants had been fishing or hunting. Officer Day acted reasonably pursuant to statutory authority and in substantial conformance with IDFG policy guidelines.

The check station was narrowly focused to advance the public's interest in wildlife preservation, protection, perpetuation and management, in stark contrast to the check station struck down in *State v. Medley*, 127 Idaho 182, 898 P.2d 1093 (1995). In *Medley*, the IDFG officer in charge of the check station issued a "blanket invitation" to any additional law enforcement agency that wished to participate so that violations of laws not pertaining to fish and game could be detected. These other agency intrusions were in no way related to advancing the public's interest in wildlife management. Such is not the case before us. We hold that the check station set up by Officer Day was statutorily authorized and in compliance with I.C. §§ 36–103(b) and 36–1201(b).

## C. Application of *Brown*'s Three–Factor Balancing Test Shows that this Check Station Did Not Violate Thurman's Constitutional Rights

The proper analysis to be conducted by courts in ascertaining whether a violation of the Fourth Amendment to the United States Constitution or Article I, § 17 of the Idaho Constitution has occurred begins by determining if any search or seizure took place. There is no dispute that stopping a passenger vehicle constitutes a "seizure" under the Fourth Amendment. *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979).

The next level of inquiry is whether the seizure was reasonable. If the seizure is not made pursuant to a warrant, probable cause, or a recognized warrant exception, then in order to determine if a search is reasonable, courts must balance the legitimate governmental interest and the degree to which the seizure promotes that interest against the severity of the intrusion on the subject of the seizure. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

### 1. The public interest involved

In addition to the statutory recognition of wildlife as a vital public interest, the Idaho Supreme Court has also acknowledged that the state of Idaho has a "compelling interest in the management and conservation of its natural resources, including wildlife." *Medley*, 127 Idaho at 186, 898 P.2d at 1097 (1995). This recognition of wildlife as a resource to be preserved, protected, perpetuated and managed reinforces the Court's conclusion that "fish and game violations are matters of grave public concern which justify minimal intrusion into the public's right to privacy." *Id.* at 185, 898 P.2d at 1096.

### 2. Advancement of the public interest involved

As was stated in *Medley*, "*Routine* fish and game check stations are indeed an effective method for advancing this interest. . . . Requiring conservation officers, under these circumstances, to have probable cause before stopping suspected violators would be an enormous burden." *Id.* at 186–87, 898 P.2d at 1097–98. (emphasis in original). Officer Day had set up his check station three times at the same location in the preceding week or two. The location was in a traditionally high-violation area where hunting season was currently open. On the day in question, Officer Day stopped every vehicle that encountered his check station from the direction that exiting hunters would likely use. Officer Day asked the same two questions of every passerby. The check station at issue in this case fit the criteria identified by the Idaho Supreme Court—a routine check station meant to collect data, speedily interact with the public, and detect fish and game violations. Moreover, the officer in charge did not exer-

cise any type of unfettered discretion, but treated everyone the same.

■ Additionally, Officer Day testified that he and two other IDFG officers were the only ones available to police the whole of Owyhee County—a rural and expansive county roughly the size of the state of New Jersey—for fish and game violations. In *State v. Albaugh*, 571 N.W.2d 345, 347 (N.D. 1997), the Supreme Court of North Dakota held that "checkpoints are often the least restrictive means of effectively enforcing the game-and-fish laws" when game officers are working in rural areas. Likewise, in *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423, 430 (1980), the Oregon Supreme Court recognized that enforcing game laws was difficult and therefore endorsed a check station "placed on an isolated road where hunting activity was to be expected." We agree with our sister states and hold that setting up a check station at a point where hunters are likely to pass and at a time when hunters are likely to be returning from hunting is reasonable and maximizes the effectiveness of the check station, thereby clearly advancing the public interest in the highly regulated area of wildlife management. *See also State v. McHugh*, 630 So.2d 1259, 1267 (La.1994) (holding that "[i]n order to attain a satisfactory level of enforcement, wildlife agents must be able to make suspicionless stops of hunters in or departing from game areas during open seasons for the limited purposes of license checks and game inquiries" and if officers were not entitled to make such stops, the enforcement of game laws would be "retrenched to an unacceptable level"); *State v. Sherburne*, 571 A.2d 1181, 1185 (Me.1990) (reasoning that because fish and game officers are responsible for enforcing fish and game laws with limited numbers of personnel over a wide territory, much of which is uninhabited, fish and game checkpoints are a justified method of enforcement); *State v. Halverson*, 277 N.W.2d 723, 724 (S.D.1979) (declaring that the only effective means of implementing a statute providing fish and game officers with the right to inspect game animals in any person's possession is through road blocks or checkpoint stops in game areas).

### 3. Level of intrusion imposed by the check station

■ This factor of the *Brown* balancing test has two subparts—an objective part and a subjective part. The objective part focuses on the duration of the stop and the intensity of the investigation. *Medley*, 127 Idaho at 186, 898 P.2d at 1096, *citing Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 452, 110 S.Ct. 2481, 2486, 110 L.Ed.2d 412, 421 (1990). Officer Day's testimony was that the sixteen vehicle stops he performed lasted an average of fifteen to twenty seconds. Officer Day only asked two short questions of each person passing through and then sent them on their way. We agree with the magistrate that the objective intrusion in this case was minor.

The subjective component is measured by the stop's potential for causing fear and surprise on the part of *lawful* travelers. While some of the stops, including that of Thurman, occurred in the dark, there were reflective warning signs preceding the stopping area indicating that an IDFG check station was present, Officer Day's IDFG truck was parked sideways—displaying the IDFG reflective emblem on the door—with a blue overhead light flashing, and Officer Day himself was in full uniform. In *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 452–53, 110 S.Ct. 2481, 2486–87, 110 L.Ed.2d 412, 421–22 (1990), the United States Supreme Court found that the subjective potential for causing fear at checkpoints was low because motorists can see visible signs of authority, including uniformed officers. We agree and conclude that the nature of the stop in this case was not such that reasonable law-abiding persons would experience fear, as alleged by Thurman—a poacher.

### D. Article I, § 17 Of The Idaho Constitution Provides No Greater Protection In These Situations Than Does The Fourth Amendment To The United States Constitution

■ It is well settled that Idaho courts are free to interpret provisions of the Idaho Constitution to provide greater protection than their corresponding provisions of the

United States Constitution. *Aragon v. State,* 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988); *Gibson v. State,* 110 Idaho 631, 635, 718 P.2d 283, 287 (1986). Based on this principle, Thurman has asserted that Article I, § 17 of the Idaho Constitution provides greater protection in this instance from unreasonable searches and seizures than does the Fourth Amendment to the United States Constitution. Thurman's only support for this assertion, however, is *dicta* from *State v. Henderson,* 114 Idaho 293, 756 P.2d 1057 (1988), where the Idaho Supreme Court stated that "perhaps the most important attribute of our way of life in Idaho is individual liberty. A citizen is free to stroll the streets, hike the mountains, and float the rivers of this state without interference from the government." However, the Court in *Medley* clarified that *Henderson* "expressed no view as to whether fish and game roadblocks complied with state constitutional requirements." Thurman has not cited any other compelling authority.

▆▆▆ Like other state courts that have addressed this issue, we find no reason to announce that our state Constitution provides greater protection to the hunting public in this situation than does the Fourth Amendment to the United States Constitution. *McHugh,* 630 So.2d at 1269 (holding that statutory scheme for suspicionless stops of hunters for license checks and game inquiries did not violate state or federal constitution); *Albaugh,* 571 N.W.2d at 347 (holding that a "game-and-fish checkpoint did not violate the federal or [North Dakota] constitutions" where the officer stopped each vehicle and asked whether occupants had been hunting); *Tourtillott,* 618 P.2d at 435 (holding there was "no violation of either the federal or [Oregon] constitution" where a fish and game roadblock was conducted to check hunters' compliance with game laws). We have not been directed to anything in Idaho's history or jurisprudence that indicates a contrary result should be reached. Where the appellant does not provide a cogent basis for his assertion that the Idaho Constitution provides greater protection than the United States Constitution relative to IDFG check stations, we decline to proclaim such today. *See State v. Charpentier,* 131 Idaho 649, 653, 962 P.2d 1033, 1037 (1998); *State v. Porter,* 130 Idaho 772, 791, 948 P.2d 127, 146 (1997).

## V.

## CONCLUSION

Given the low level of intrusion caused by Officer Day's check station, his non-exercise of discretion in any material fashion, the public's interest in protecting, preserving, perpetuating and managing its wildlife resources, and the efficacy of check stations in advancing this interest in wildlife management, we hold that the balancing envisioned in *Brown* and *Medley* weigh decidedly in favor of the conclusion that the stop of Thurman was reasonable.

No violation of the United States or Idaho Constitutions' protection from unreasonable searches and seizures occurred when Officer Day stopped Thurman. Hunting is a highly regulated activity, which in turn, correspondingly reduces hunters' reasonable expectations of privacy. The wild game within our state belongs to the people as a whole in their collective, sovereign capacity and is treated as a common trust. We hold that it is constitutionally reasonable to briefly detain the traveling public, in or near designated hunting areas during hunting season, to question hunters, check their licenses, inquire about game taken, inspect game in hunters' possession, and collect biological data. In this capacity, fish and game officers not only act as law enforcers, but also as public trustees protecting, conserving, and promoting the replenishment of Idaho's wildlife.

Accordingly, we affirm the magistrate's order denying Thurman's motion to suppress the evidence obtained at the IDFG check station.

Chief Judge PERRY and Judge LANSING, concur.