**STATE of North Dakota, Plaintiff and Appellant,**

v.

**Tom WETZEL, Defendant and Appellee.**

**Crim. No. 890343.**

Supreme Court of North Dakota.

May 14, 1990.

Alan K. Duppler, State's Atty., Stanton, for plaintiff and appellant.

Larry W. Quast of Hagen, Quast & Alexander, Beulah, for defendant and appellee.

VANDE WALLE, Justice.

The State of North Dakota appealed from an order of the County Court for Mercer County granting Tom A. Wetzel's motion to suppress evidence obtained during a vehicle safety inspection at a highway checkpoint. The State contends that its checkpoint and procedures for stopping oncoming vehicles were constitutionally permissible. We agree and reverse the county court's suppression order.

On August 3, 1989, Trooper Ronald Stanley of the North Dakota Highway Patrol established a checkpoint on North Dakota highway 200 between Pick City and River- dale for the purpose of conducting routine vehicle safety inspections. Each trooper with the Highway Patrol is required to perform three hundred inspections per year. Tom Wetzel's automobile was the sixteenth vehicle stopped at the checkpoint. After inspecting the safety features of the vehicle, Trooper Stanley asked Wetzel for his driver's license. Wetzel failed to produce a license and it was eventually determined that his driving privileges were under suspension. Wetzel was charged with driving under suspension. *See* NDCC § 39-06-42.

Wetzel made a motion in the County Court for Mercer County to suppress all evidence obtained by Trooper Stanley resulting from the checkpoint stop. Wetzel claimed that Trooper Stanley exercised "unbridled discretion" in determining which vehicles to stop at the checkpoint thereby causing the stop to be unconstitutional under the Fourth Amendment of the United States Constitution and Article I, § 8 of the North Dakota Constitution. Additionally, Wetzel argued that Trooper Stanley did not have any reasonable and articulable suspicion for stopping his automobile.

During the hearing on Wetzel's motion to suppress, Trooper Stanley testified as to the procedures he used at the checkpoint. He stated that there was a department procedure regarding vehicle inspection sequence. That procedure, which he testified he utilized and described on the top of his Highway Patrol vehicle inspection form, was to stop a car, conduct an inspection, and then "stop the next available vehicle when safe."[1] Not all oncoming cars were

---

1. Trooper Stanley testified that the Highway Patrol's procedure at such checkpoints was to "stop the next available vehicle when safe," and that he wrote the procedure down on the top of his vehicle inspection form. A written copy of the department's policy was not entered into evidence. However, the Highway Patrol's procedure for motor vehicle inspection checkpoints can be found in Policy 3–7, *North Dakota Highway Patrol Policy Manual*, which states in relevant part:

"TITLE: MOTOR VEHICLE INSPECTION

"POLICY

"B. Motorists and officer safety will be of primary consideration when selecting a location, time period, or pattern of vehicles to be inspected.

"PROCEDURE

"D. Prior to beginning the inspection of motor vehicles, officers will determine the order in which vehicles are to be inspected. For example; every vehicle, or every third, fifth,

inspected at the checkpoint and other automobiles were able to freely pass through the checkpoint while he was conducting an inspection on a stopped vehicle. Trooper Stanley further testified that it was his decision to stop the next available vehicle and to determine when it was safe to do so. In this regard, he noted that if a group of five or six automobiles approached the checkpoint, he would not stand on the road to flag over a vehicle as it would not be safe for either himself or the traveling public. Trooper Stanley also testified as to the vehicle inspection procedures. Once a vehicle was stopped, he would inspect the automobile's front headlights, front turn signals, rear turn signals, rear brakelights, windshield wipers, and horn. Examination of the driver's license was also part of the routine check. All vehicles stopped were logged onto the vehicle inspection form which indicated whether the automobile had any defects, and whether any citations were issued. Finally, Trooper Stanley indicated that his checkpoint was visible by drivers for approximately two miles, that Wetzel's automobile was traveling alone on the highway at the time it was stopped, and that he had no articulable and reasonable suspicion for stopping Wetzel's vehicle other than for the fact that he was conducting a vehicle safety inspection checkpoint.

After the suppression hearing, the trial court granted Wetzel's motion to suppress, concluding that the State did not adequately meet its burden of establishing that Trooper Stanley acted without unconstrained discretion in selecting vehicles to stop.[2]

or tenth vehicle, or in any other sequence that can be safely managed.
"E. If only one officer is conducting vehicle inspections, that officer shall inspect the next vehicle that approaches the officer's inspection point after releasing the last vehicle inspected.
"F. In every instance and prior to beginning the inspection of motor vehicles, the order in which vehicles are to be inspected will be noted on top of SFN 3435 (NDHP Form 325). A separate SFN 3435 will be completed each time the order of inspection or the inspection site is changed.
.       .       .       .       ."
While it is apparent that Trooper Stanley was following the procedure in subsection E of Poli-

The sole issue presented on appeal is whether the procedure utilized by Trooper Stanley in stopping vehicles at the checkpoint was constitutionally impermissible because it provided him with unconstrained discretion over which vehicles to stop.

In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court confronted the question of what procedures were constitutionally permissible as a means of checking drivers' licenses, vehicle registration, and vehicle mechanical conditions. In *Prouse,* a patrolman randomly stopped the defendant's automobile for the sole purpose of checking his driver's license and registration. As the patrolman explained, "I saw the car in the area and wasn't answering any complaints, so I decided to pull them off." *Prouse, supra,* 440 U.S. at 650–51, 99 S.Ct. at 1394, 59 L.Ed.2d at 665. The patrolman was not acting pursuant to any department guidelines or procedures for conducting spot checks. Moreover, the patrolman had no reasonable suspicion or probable cause for stopping the defendant's vehicle. The sole issue determined by the *Prouse* Court was whether the purely random stop for a license and registration check constituted an unreasonable seizure under the Fourth Amendment thereby causing evidence seized during the stop to be suppressed.

The Supreme Court noted that the Fourth Amendment was implicated in these types of cases "because stopping an automobile and detaining its occupants consti-

cy 3–7, we will consider the stop of Wetzel's automobile in light of Trooper Stanley's interpretation and utilization of the policy as was expressed in his testimony.

**2.** After concluding that the State did not adequately meet its burden, the trial court observed: "As a matter of fact, this Court has a great deal of difficulty defining as to what the burden should be or in the alternative as to the criteria that should be used by officers in conducting a vehicle safety check."

tutes a 'seizure' ... even though the purpose of the stop is limited and the resulting detention quite brief." *Prouse, supra,* 440 U.S. at 653, 99 S.Ct. at 1396, 59 L.Ed.2d at 667. Noting that the essential purpose of the proscriptions of the Fourth Amendment was to impose a standard of " 'reasonableness' upon the exercise of discretion by government officials," the Court employed a balancing test to weigh the competing interests of the government in highway safety against an individual's reasonable expectation of privacy in his or her automobile under the Fourth Amendment. *Prouse, supra,* 440 U.S. at 653–54, 99 S.Ct. at 1396, 59 L.Ed.2d at 667.

In weighing the competing interests, the Supreme Court recognized that "States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence the licensing, registration, and vehicle inspection requirements are being observed." *Prouse, supra,* 440 U.S. at 658, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. On the other hand, the Court also considered the physical and psychological intrusiveness of random stops on an individual's Fourth Amendment interests. It noted that purely random, roving spot-checks by officers would make the individual subject to an unsettling show of the police power of the community, "interfere with freedom of movement," and create "substantial anxiety" in the individual. *Prouse, supra,* 440 U.S. at 657, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. The Court further compared the intrusiveness of roving, random stops by police to roadblock checkpoints in which all vehicles are stopped, and all motorists are subjected to the show of the community's police power. It noted that "[a]t traffic checkpoints the motorist can see that the other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *Id.*

The overall effect of a purely random spot-check on the individual's privacy interest, when weighed against the total discretion of the police officer to conduct a spot-check, led the Court to hold that:

"[E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. *This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.* [Emphasis added.] *Prouse, supra,* 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673–74.

Justice Blackmun, in his concurring opinion in *Prouse,* noted that the Court had merely furnished one possible alternative to curbing the unbridled discretion of officers in stopping vehicles when it suggested stopping all oncoming traffic. He explained:

"The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes *other not purely random stops* (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop." [Emphasis added.] *Prouse, supra,* 440 U.S. at 664, 99 S.Ct. at 1401, 59 L.Ed.2d at 674.

 It is clear that what disturbed the Court in *Prouse* was the patrolman's unconstrained discretion in randomly stopping any car, at any time, and under any procedure he desired. *State v. Goehring,* 374 N.W.2d 882, 888 (N.D.1985). To meet the requirements of *Prouse,* an officer conducting an inspection checkpoint must maintain some systematic method of stopping vehicles, and "[i]t is not necessary

for [the] checkpoint to stop every car in order to be systematic but only for officers to be following *some pattern* that will minimize their discretion in choosing whether to stop a particular auto." [Emphasis added.] 1 LaFave, *Criminal Procedure* § 3.9 (1984). *Accord,* Ringel, *Searches & Seizures, Arrests and Confessions,* § 11.6(c) (1990) [short of some systematic approach to stopping vehicles, government agents may make inspection stops only based upon reasonable suspicion]. Simply stated, it is the nonsystematic, purely random spot-checks which allow an officer unbridled discretion in selecting automobiles to stop, and which place substantial anxiety on vehicles' occupants that is the evil sought to be avoided by the Fourth Amendment.

The United States Supreme Court has not revisited this matter since *Prouse,* and while our Court has never had the opportunity to directly entertain whether a particular procedure for checkpoint stops is in conformity with *Prouse,*[3] other courts have considered a myriad of policies and procedures for systematically stopping vehicles at roadside checkpoints. Courts have frequently upheld procedures in which officers have stopped all oncoming traffic at a checkpoint;[4] and procedures where officers have stopped vehicles in some predetermined numerical order, such as every fifth vehicle.[5] In a number of cases from state courts, procedures very similar to the ones used by Trooper Stanley were upheld as constitutional under the Fourth Amendment.

For example, in *State v. Goines,* 16 Ohio App.3d 168, 474 N.E.2d 1219 (1984), an Ohio State Trooper was conducting a safety check of motor vehicles at a checkpoint near the city of Springfield. The trooper would inspect the mechanical operations of the vehicles stopped and check the operator's driver's license. The defendant in *Goines* was stopped at the checkpoint by the trooper and was eventually charged with driving under suspension when it was discovered that his license had been suspended. With regard to the method employed in stopping vehicles at the checkpoint, the Court of Appeals of Ohio noted: "[The trooper] stated that after he had completed the inspection of one vehicle, *he flagged down the next available motor-*

---

3. In *State v. Goehring,* 374 N.W.2d 882 (N.D. 1985), we dealt with a factual situation in which a patrolman stopped the defendant's automobile at a vehicle safety inspection checkpoint, and discovered that his driver's license had been suspended. The patrolman, however, did not testify as to the procedures he used in stopping the defendant's vehicle, nor was any written policy for stopping vehicles entered into the record at trial. In reversing the trial court's denial of the defendant's motion to suppress, we determined that the State did not adequately demonstrate compliance with *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and stated: "We have no way of knowing whether [the] procedures allow the officers no discretion, some discretion, or total discretion in deciding which vehicles are flagged over and checked. Without knowing what these procedures are ... we can hardly rule that [the] procedures are in conformity with the constitution and the principles of *Prouse." Goehring, supra,* 374 N.W.2d at 888. In the instant case, Trooper Stanley testified as to the procedures utilized for stopping automobiles at his vehicle safety inspection checkpoint, and that those procedures were in compliance with the Highway Patrol policy. That policy is a matter of public record.

4. *See, e.g., State v. Super. Ct.,* 143 Ariz. 45, 691 P.2d 1073 (1984); *People v. Andrews,* 173 Colo. 510, 484 P.2d 1207 (1971); *State v. Golden,* 171 Ga.App. 27, 318 S.E.2d 693 (1984); *People v. Bartley,* 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880 (1985); *State v. Riley,* 377 N.W.2d 242 (Iowa Ct.App.1985); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983); *Kinslow v. Commonwealth,* 660 S.W.2d 677 (Ky.Ct.App. 1983); *State v. Cloukey,* 486 A.2d 143 (Me.1985); *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984); *Commonwealth v. Trumble,* 396 Mass. 81, 483 N.E.2d 1102 (1985); *Miller v. State,* 373 So.2d 1004 (Miss.1979); *State v. Bloom,* 90 N.M. 192, 561 P.2d 465 (1977); *People v. Scott,* 63 N.Y.2d 518, 483 N.Y.S.2d 649, 473 N.E.2d 1 (1984); *Lowe v. Commonwealth,* 230 Va. 346, 337 S.E.2d 273 (1985). *See generally* Annotation, *Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations,* 37 A.L.R.4th 10 (1985).

5. *See, e.g., Ingersall v. Palmer,* 193 Cal.App.3d 617, 221 Cal.Rptr. 659 (1985); *State v. Jones,* 483 So.2d 433 (Fla.1986); *State v. Garcia,* 481 N.E.2d 148 (Ind.1985); *State v. Coccomo,* 177 N.J.Super. 575, 427 A.2d 131 (1980). *See generally* Annotation, *Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations,* 37 A.L.R.4th 10 (1985).

*ist.*" [Emphasis added.] *Goines, supra,* 16 Ohio App.3d at 171, 474 N.E.2d at 1222. The court further noted that not all vehicles were stopped at the checkpoint, and that automobiles were permitted to pass through the checkpoint while the trooper was inspecting a stopped vehicle. After examining *Delaware v. Prouse, supra,* and balancing the interests of the state of Ohio in public safety against the privacy interests of the defendant, the court upheld the trooper's procedure for stopping vehicles as systematic and reasonable under the Fourth Amendment. When comparing the roving, random spot-check involved in *Prouse* with the stop in the case before it, the court found that "the facts suggest the stopping was not an unbridled act of whim, but was a part of a *calculated pattern* of inspecting automobiles at a designated checkpoint." *Goines, supra,* 16 Ohio App.3d at 171, 474 N.E.2d at 1222. Finally, the court stated that "[w]hile the Supreme Court in *Prouse* held that a roadblock inspection scheme clearly would pass constitutional muster, we do not believe the decision rules out inspection 'checkpoints' which, due to limited manpower, permits only some passing vehicles to be inspected." *Id. See also State v. Shankle,* 58 Or.App. 134, 647 P.2d 959 (1982) [license and registration inspection procedure whereby first passing vehicle was stopped with all other vehicles permitted to pass until the inspection was complete at which time the next vehicle was stopped for inspection was systematic under the Fourth Amendment and had none of the evils of a purely random stop]; *People v. Estrada,* 68 Ill.App.3d 272, 24 Ill.Dec. 924, 386 N.E.2d 128, *cert. denied,* 444 U.S. 968, 100 S.Ct. 459, 62 L.Ed.2d 382 (1979) [roadside vehicle safety checkpoint was reasonable and systematic for Fourth Amendment purposes where the officer "would inspect one vehicle and turn him loose and whatever vehicle came along next would be the next vehicle to be checked"].

■ With the aforementioned principles in mind, we turn to the vehicle safety checkpoint involved in the instant case. The State of North Dakota has a vital interest in ensuring that the vehicles on its roads are safe for operation, and that licensing requirements are being observed. *Delaware v. Prouse, supra.* When balancing this interest against the intrusiveness of Trooper Stanley's checkpoint into Wetzel's privacy rights, we believe that the checkpoint was "reasonable" under the Fourth Amendment. The checkpoint in this case was more like a roadblock, as opposed to the roving, random spot-check in *Prouse,* in the sense that it was fixed in position, had visible signs of the State's police authority, and could be seen by oncoming traffic for approximately two miles thereby allowing automobile operators to observe other vehicles being stopped and making them much less likely to be frightened or annoyed by the State's intrusion.

Additionally, we find that the procedure utilized for stopping vehicles at the checkpoint was sufficiently systematic to pass constitutional muster. As was previously mentioned, "[i]t is not necessary for [the] checkpoint to stop every car in order to be systematic but only for officers to be following *some pattern* that will minimize their discretion in choosing whether to stop a particular auto." [Emphasis added.] 1 LaFave, *Criminal Procedure,* § 3.9 (1984). Here, Trooper Stanley had an established vehicle safety checkpoint along the highway. His pattern, which complied with Highway Patrol policy, was to stop an automobile, inspect it, and then "stop the next available vehicle when safe."

We do not believe that the "when safe" condition permits the exercise of "unbridled discretion." Rather, we assume that such a condition is, if not specifically contained therein, implied in any policy concerning roadblock or checkpoint stops, *i.e.,* an officer is not required to stop vehicles pursuant to the policy when unsafe or, in the alternative, take the risk of invalidating the stop because he does not rigidly adhere to the policy. In any event, Wetzel's automobile was traveling alone when Trooper Stanley stopped it as the next available vehicle.

Courts in other jurisdictions have found nearly identical procedures for stopping vehicles to be systematic for purposes of

curbing officer discretion. *Goines, supra; Shankle, supra; Estrada, supra.* In short, when compared to the random, roving stop in *Prouse, supra,* where the officer simply "saw a car in the area," "wasn't answering any complaints," and just "decided to pull them off" for a license and registration inspection, the facts of the instant case illustrate that Trooper Stanley's stop of Wetzel's automobile wasn't merely an act of unbridled whim, but was a part of a calculated pattern established for inspecting vehicles at a fixed checkpoint.

Because we find that the inspection checkpoint in the instant case was both reasonable and systematic under the Fourth Amendment, we reverse the suppression order of the trial court.

ERICKSTAD, C.J., and GIERKE, LEVINE and MESCHKE, JJ., concur.