1997 ND 229

**STATE of North Dakota, Plaintiff and Appellant,**

**v.**

**Harold ALBAUGH, Defendant and Appellee.**

**Criminal Nos. 970074, 970075.**

Supreme Court of North Dakota.

Dec. 2, 1997.

Larry W. Quast (argued), State's Attorney, Stanton, for plaintiff and appellant.

Loren C. McCray (argued), Beulah, for defendant and appellee.

MESCHKE, Justice.

[¶ 1] The State appeals from an order suppressing evidence discovered after Harold Albaugh's van was stopped at a checkpoint for the North Dakota Game and Fish Department. We conclude that the checkpoint was constitutional, and that the game warden had authority, after seeing open beer cans in Albaugh's van, to briefly detain him until a nearby police officer could investigate. Accordingly, we reverse the suppression order and remand for trial.

I. FACTS

[¶ 2] On October 13, 1996, the North Dakota Game and Fish Department conducted a checkpoint on Highway 200 at the west end of Garrison Dam, near one mile east of Pick City. Two game warden supervisors, two game wardens, a Department biologist, the superintendent of Lake Sakakawea State Park, a sheriff's deputy, and the Chief of Police of Pick City, all in uniform, conducted the checkpoint under a specific written policy adopted by the Department. Appropriate signs warned approaching drivers about the checkpoint; six vehicles with official insignias and top red lights were parked there; and orange cones marked the checkpoint area.

[¶ 3] Game Warden Supervisor Floyd Chrest served as the point man, stopping vehicles with a hand-held stop sign as they approached the checkpoint. Chrest testified he stopped all eastbound traffic except semi-trailer trucks that would not ordinarily be used in hunting and that would have difficulty stopping and restarting. Chrest told each driver this was a game-and-fish check and asked the occupants if they had been hunting. If they said no, he sent them on their way. If they said yes, he asked them to pull into a separate lane for further inspection by the other game officials.

[¶ 4] Albaugh came to the checkpoint in his van and stopped when Chrest displayed the stop sign. Chrest approached the driver's door and, while ascertaining Albaugh had not been hunting, saw two open cans of beer in the center console of the van. After telling Albaugh to wait there, Chrest called over Police Chief Dean Danzeisen, who was standing about 25 feet away, and told him there were open containers. Chief Danzeisen investigated, conducted field sobriety tests, and arrested Albaugh for driving under suspension and for driving while impaired. Albaugh was also charged with an open-receptacle violation, but that charge has not been appealed in this case.

[¶ 5] Albaugh moved to suppress all evidence, arguing that the game-and-fish checkpoint violated the Fourth Amendment of the United States Constitution or Section 8, Article I of the North Dakota Constitution, and that Chrest had no authority to detain him

until Chief Danzeisen could investigate. The trial court did not decide the constitutional challenge, but concluded that Chrest had no authority to detain Albaugh for the open-receptacle violation once he saw no game violations. The court therefore suppressed all evidence discovered after Chrest detained Albaugh. The State appealed.

## II. CHECKPOINT CONSTITUTIONALITY

[¶ 6] A Fourth Amendment "seizure" occurs when a vehicle is stopped by police at a checkpoint. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *State v. Everson*, 474 N.W.2d 695, 698 (N.D. 1991); *State v. Wetzel*, 456 N.W.2d 115, 117–118 (N.D.1990). However, individualized reasonable suspicion is not required for checkpoint stops. *United States v. Martinez–Fuerte*, 428 U.S. 543, 561–562, 96 S.Ct. 3074, 3084–3085, 49 L.Ed.2d 1116 (1976). Checkpoint stops nevertheless present important concerns under the Fourth Amendment and Section 8, Article I of the North Dakota Constitution. *See Sitz*, 496 U.S. at 450, 110 S.Ct. at 2485; *Everson*, 474 N.W.2d at 698–699. The basic question is whether the seizure is reasonable.

[¶ 7] To assess the reasonableness of a checkpoint stop under both the federal and state constitutions, we employ a three-part analysis, balancing the State's interest in the checkpoint's purpose against the degree that the checkpoint advances that interest and the severity of the intrusion upon the individual's liberty. *Sitz*, 496 U.S. at 448–449, 110 S.Ct. at 2484–2485; *City of Bismarck v. Uhden*, 513 N.W.2d 373, 378 (N.D.1994). We have approved other types of highway checkpoints under this constitutional standard. *See Uhden*, 513 N.W.2d at 379 (sobriety checkpoint);

*Everson*, 474 N.W.2d at 703 (checkpoint for drugs, drivers license, and vehicle registration); *Wetzel*, 456 N.W.2d at 121 (safety inspection checkpoint). This is the first time we have considered a game-and-fish checkpoint.

[¶ 8] Courts elsewhere have employed the same balancing analysis to uphold the constitutionality of game-and-fish checkpoints. *See People v. Perez*, 51 Cal.App.4th 1168, 59 Cal.Rptr.2d 596 (1996); *State v. McHugh*, 630 So.2d 1259 (La.1994); *State v. Sherburne*, 571 A.2d 1181 (Me.1990); *Drane v. State*, 493 So.2d 294 (Miss.1986); *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423 (1980); *State v. Halverson*, 277 N.W.2d 723 (S.D. 1979); *see also* John Wesley Hall, Jr., Search and Seizure § 17:11 (2d ed.1991); Jeffrey F. Ghent, Annotation, *Validity of Roadblocks by State or Local Officials for Purpose of Enforcing Fish or Game Laws*, 87 A.L.R.4th 981 (1991).[1] We use the three-part balancing analysis here.

[¶ 9] The first part of the analysis requires us to assess the importance of the public interest served by the checkpoint. The State owns all wildlife within its borders "for the purpose of regulating the enjoyment, use, possession, disposition, and conservation thereof." NDCC 20.1–01–03. This court has long recognized "the great and urgent need of legislation for protection and conservation of our big game." *State v. Miller*, 129 N.W.2d 356, 364 (N.D.1964); *see also State v. Reich*, 298 N.W.2d 468, 473 (N.D.1980). As precedents elsewhere have recognized, *see Perez*, 59 Cal.Rptr.2d at 600; *State v. Medley*, 127 Idaho 182, 898 P.2d 1093, 1097 (1995); *McHugh*, 630 So.2d at 1264–1265; *Sherburne*, 571 A.2d at 1184; *Halverson*, 277 N.W.2d at 724, the State has a compelling

---

1. Our research uncovered only two cases where game-and-fish checkpoints have been held unconstitutional. In *State v. Medley*, 127 Idaho 182, 898 P.2d 1093, 1097–1098 (1995), the court held that "routine" game-and-fish checkpoints would be constitutional, but concluded that the particular checkpoint was "hardly" routine because a "blanket invitation" had been extended to numerous other law enforcement agencies to participate and seek evidence of other crimes. In *State v. Baldwin*, 124 N.H. 770, 475 A.2d 522, 527 (1984), the court found it unnecessary to determine the validity of game-and-fish checkpoints in general, concluding that the seizure in question was unreasonable because the scope of the questions asked by the officer after stopping the defendant at the checkpoint "clearly exceeded the bounds of any permissible check to determine compliance with this State's motor vehicle licensing and registration or fish and game laws." Neither case is like this one.

interest in managing and preserving its wildlife.

[¶ 10] We analyze the degree that this checkpoint advanced the State's legitimate interest in protecting and preserving wildlife. In doing so, we bear in mind the Supreme Court's admonition that this part of the balancing analysis

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.... [F]or purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

*Sitz,* 496 U.S. at 453–454, 110 S.Ct. at 2487; *see also Everson,* 474 N.W.2d at 700. Game wardens surely face a daunting task when attempting to enforce the game laws in a rural region like North Dakota. In assessing the need for checkpoints to do so, courts have stressed the limited manpower available to game officials, the vast and remote areas where hunting usually occurs, and the difficulty in detecting game violations without suspicionless stops. *See Perez,* 59 Cal. Rptr.2d at 600; *Medley,* 898 P.2d at 1097–1098; *McHugh,* 630 So.2d at 1267; *Sherburne,* 571 A.2d at 1184–1185; *Tourtillott,* 618 P.2d at 430; *Halverson,* 277 N.W.2d at 724. As *McHugh* at 1270, explained, checkpoints are often the least restrictive means of effectively enforcing the game-and-fish laws.

[¶ 11] This checkpoint was designed to maximize its effectiveness. It was set up on a highway coming out of probable hunting areas. It was conducted between 3:00 P.M. and 6:00 P.M. on a Sunday afternoon during hunting season, when many hunters would be returning home. We conclude this checkpoint was an effective means of advancing the State's interest in preserving and managing wildlife.

[¶ 12] Albaugh asserts the State failed to meet its burden of demonstrating the effectiveness of this checkpoint because the State did not present statistical evidence comparing the total number of vehicles stopped to the number of violations discovered. That ratio may be viewed as one indicator of the effectiveness of a checkpoint. *See, e.g., Sitz,* 496 U.S. at 454–455;, 110 S.Ct. at 2487–2488 *Everson,* 474 N.W.2d at 702–703. However, there is no absolute requirement that such a ratio be determined in every case. The effectiveness of the checkpoint is but one factor to be weighed under the balancing test, *Everson,* 474 N.W.2d at 703 n. 3, and the ratio of violations to total vehicles stopped is but one evidentiary means of assessing effectiveness. *See* 4 Wayne R. LaFave, Search and Seizure § 10.8(d) (1996) (" 'effectiveness' ... is a matter which need not be measured solely in terms of the number of perpetrators apprehended"). Besides apprehending violators, checkpoints serve the additional purpose of deterring illegal conduct. *See* 4 LaFave, at § 10.8(d); *Martinez–Fuerte,* 428 U.S. at 557, 96 S.Ct. at 3082–3083. The constitutionality of a checkpoint calls for balancing several competing interests, and it is not susceptible of a precise mathematical calculation.

[¶ 13] This checkpoint was conducted for three hours on a Sunday afternoon in a rural area. In that short time, the Department stopped 117 vehicles carrying hunters and discovered fourteen game violations. The effectiveness of this checkpoint compares favorably with checkpoint results upheld in *Sitz,* where 1.6 percent of the drivers stopped at a sobriety checkpoint were arrested, and *Martinez–Fuerte,* where only .12 percent of the vehicles stopped contained illegal aliens. *See Sitz,* 496 U.S. at 454–455, 110 S.Ct. at 2487–2488; *Martinez–Fuerte,* 428 U.S. at 554, 96 S.Ct. at 3081. In *Everson,* 474 N.W.2d at 702–703, we upheld the drug-interdiction phase of a multi-purpose checkpoint even though the four-day checkpoint found only two drug violations, or .196 percent of the total vehicles stopped. We conclude that this checkpoint, identifying fourteen game violations in three hours, was reasonably effective.

[¶ 14] Finally, we consider this checkpoint's intrusion upon individual liberty. Checkpoints in general physically intrude

minimally on the motoring public. *Sitz,* 496 U.S. at 451–452, 110 S.Ct. at 2485–2486; *Martinez–Fuerte,* 428 U.S. at 557–558, 96 S.Ct. at 3082–3083; *Everson,* 474 N.W.2d at 702. The physical intrusiveness in this case was slight. Chrest stopped each vehicle and asked whether the occupants had been hunting. If the answers were no, he sent them on their way at once. The entire stop took a matter of seconds. A longer stop occurred only if the occupants had been hunting or if, as in this case, some other violation was discovered during the brief initial stop.[2]

[¶ 15] The psychological intrusion on occupants was also minimized by the methods used to implement the checkpoint. All vehicles were stopped, rather than giving officers discretion to select vehicles; warning signs notified motorists of the checkpoint a significant distance ahead; all officers wore uniforms; and vehicles with insignias and red lights informed motorists about the official character of the checkpoint. As our guiding precedents have concluded, *Sitz,* 496 U.S. at 452–453, 110 S.Ct. at 2486–2487; *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083; *Uhden,* 513 N.W.2d at 378–379; *Wetzel,* 456 N.W.2d at 118, these facts demonstrate minimal psychological intrusion on individual liberty.

[¶ 16] One aspect of psychological intrusion to consider is the amount of discretion given individual officers in conducting the checkpoint. A "central concern" in balancing the competing societal interests is "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *see also State v. Goehring,* 374 N.W.2d 882, 888 (N.D.1985). Here, the checkpoint was conducted under a comprehensive policy formally adopted by the Department. Approval was obtained from the local state's attorney before conducting the checkpoint. The wardens and officers attended a briefing before conducting the checkpoint to ensure all policy directions

were complied with. All vehicles were stopped, a single question was asked, and drivers who had not been hunting were detained only momentarily. Under these circumstances, the officers had little or no discretion in the conduct of the checkpoint.

[¶ 17] Albaugh argues, however, that there was an unconstitutional element of discretion because the officers followed and stopped vehicles that turned off onto a nearby gravel road to avoid the checkpoint if it looked like they had been hunting. Chief Danzeisen testified he stopped only one vehicle avoiding the checkpoint. Albaugh asserts this exercise of discretion made the entire checkpoint constitutionally invalid.

[¶ 18] Albaugh cites no factually similar cases holding such conduct condemns the checkpoint. Furthermore, as *Uhden,* 513 N.W.2d at 378 n. 8, indicates, this minimal exercise of discretion as to one vehicle is but one relevant factor in the overall analysis of the intrusiveness of the stop and, by itself, is not conclusive.

[¶ 19] Weighing the State's compelling interest in preserving its wildlife, the effectiveness of this method used to advance that interest, and the minimal level of intrusiveness, we conclude this checkpoint was constitutional.

## III. WARDEN'S DETENTION AUTHORITY

[¶ 20] Albaugh argues, even if the initial stop of his van at the checkpoint was valid, Chrest had no authority to detain him after ascertaining he had not been hunting. The State concedes that, once Chrest found the occupants of Albaugh's van had not been hunting, Chrest's further detention of Albaugh was a separate "seizure" apart from the checkpoint stop.

[¶ 21] To analyze this argument, we examine a game warden's statutory authority. The legislature has equipped game officers with all the powers of peace officers to enforce wildlife laws and rules. NDCC 20.1–

---

**2.** As in *Sitz,* 496 U.S. at 450–451, 110 S.Ct. at 2485–2486, Albaugh has challenged only the validity of the checkpoint generally, and we need only address the initial stop of each motorist through the checkpoint, not the further detention of motorists who had been hunting.

02–15. Additionally, NDCC 20.1–02–15.1 invests game officers with other powers:

*Additional powers of director, deputy director, chief game wardens, or district game wardens.* The director, deputy director, chief game wardens, or district game wardens have the power of a peace officer in the following circumstances:

1. To enforce state laws and rules on any game refuge, game management area or other land or water owned, leased, or managed by the department.

2. When responding to requests from other law enforcement agencies or officers for aid and assistance. For the purposes of this subsection, a request from a law enforcement agency or officer means only a request for assistance as to a particular and singular violation or suspicion of violation of law, and does not constitute a continuous request for assistance outside the purview of enforcement of the provisions of this title....

Thus, a game warden is empowered to assist police officers for a particular purpose.

[¶ 22] In this case, Chrest detained Albaugh for further investigation of the open containers. He was not then enforcing state laws or rules on wildlife under NDCC 20.1–02–15, nor did his actions take place on a game refuge, game management area, or land owned, leased, or managed by the Department under NDCC 20.1–02–15.1(1). Therefore, whether Chrest had authority under the "aid and assistance" subsection of NDCC 20.1–02–15.1(2) is the dispositive question.

[¶ 23] When police officers and game wardens are working together as a "team" on a game-and-fish checkpoint, a reasonable construction of the statute permits the implication of a request from police officers among the "team" for "aid and assistance" on other and non-wildlife offenses discovered during checkpoint activities. The statute cautions that the request may not constitute "a continuous request for assistance outside the purview of enforcement of the provisions of this title." Thus, for example, a county sheriff could not make a continuing, blanket request to all game wardens to arrest motorists for speeding when the wardens are individually out and about on duty within the county. However, in this case, Chrest was clearly enforcing game laws within the provisions of NDCC Title 20.1 when conducting the checkpoint. The "team" context reasonably implies a request from the participating police officers for aid and assistance by a game warden when the warden happens to discover a non-game violation. Thus, under NDCC 20.1–02–15.1(2), Chrest had the "team" power of a police officer, including the authority to detain Albaugh briefly for further investigation, after seeing the open beer cans in the van.

[¶ 24] The Department's policy requires a police officer be present at a game-and-fish checkpoint:

The local game warden shall contact the state patrol, sheriff's department, or the local police department for assistance in selecting a site and help with traffic direction....

This policy calls for the game officials and police officers to work as a "team" in conducting the checkpoint, and this context implies a request for aid and assistance if a game warden discovers other violations incidental to the checkpoint purposes.

[¶ 25] We construe statutes to avoid absurd results. *State v. Trosen,* 547 N.W.2d 735, 739 (N.D.1996). There is a potentially dangerous result under the statute if we interpret it to mean Chrest had no authority to briefly detain Albaugh for the few moments necessary for Chief Danzeisen to walk over to investigate further. The trial court suggested Chrest's proper course of conduct would have been to let Albaugh go, then tell Chief Danzeisen about the open containers observed. The trial court thought Chief Danzeisen would then have had reasonable suspicion to pursue and stop Albaugh's van to investigate. An enforcement procedure that would permit a drunk driving suspect to go on his way after he had been lawfully stopped and aroused a reasonable suspicion of unlawful conduct but then would require the nearby officer to chase him down would be absurd; it would create a greater poten-

tial of danger. Such an interpretation would elevate form over substance in the worst possible way, and it would unduly confine the intent of the statute.

[¶ 26] We conclude Chrest had statutory authority to briefly detain Albaugh for further investigation after discovering the open cans of beer in plain view in Albaugh's van.

## IV. CONCLUSION

[¶ 27] This game-and-fish checkpoint did not violate the federal or state constitutions, and Chrest had authority to detain Albaugh momentarily after observing open beer cans in his van. Therefore, the trial court erred in suppressing the evidence discovered after Albaugh had been detained. We reverse the order suppressing evidence and remand for trial.

[¶ 28] VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.

