2009 ND 181

**Brandan James MARTIN, Petitioner and Appellant**

v.

**NORTH DAKOTA DEPARTMENT OF TRANSPORTATION, Respondent and Appellee.**

No. 20090105.

Supreme Court of North Dakota.

Oct. 13, 2009.

Mary Elizabeth Nordsven, Dickinson, ND, for petitioner and appellant.

Andrew Moraghan, Assistant Attorney General, Office of Attorney General, Bismarck, ND, for respondent and appellee.

CROTHERS, Justice.

[¶ 1] Brandan Martin appeals from a district court judgment affirming the North Dakota Department of Transportation's suspension of his driving privileges for 91 days. We affirm the judgment.

I

[¶ 2] A sobriety checkpoint was established on July 3, 2008, near Dickinson, North Dakota. The stated purpose of the checkpoint was to deter drunk driving, to create a safe driving environment and to increase awareness of the problems caused by drunk driving. Martin entered the checkpoint shortly before 10:00 p.m. and was met by a North Dakota Highway Patrol Officer. Although Martin stated he had not been drinking, the officer asked Martin to pull into a nearby parking lot after observing an unopened can of beer in Martin's center console and smelling an odor of alcohol emanating from Martin's vehicle.

[¶ 3] After Martin parked his vehicle, he joined the officer in his squad car, where the officer again smelled the odor of alcohol. Martin submitted to field sobriety testing, where he failed the horizontal gaze nystagmus, the alphabet, the counting backwards and the finger-dexterity tests. The officer had Martin spit out his chewing tobacco and visually inspected Martin's mouth to confirm it was empty before administering an S–D2 breath test on Martin. Martin registered a .114 percent blood alcohol concentration ("BAC") and was placed under arrest for driving under the influence of alcohol with a BAC of .08 percent or greater. Once at Stark County Jail, Martin asserted his mouth was empty and was given an Intoxilyzer breath test, registering a .10 percent BAC.

[¶ 4] Martin was cited for driving under the influence of alcohol, and his driving privileges were suspended for 91 days. An administrative hearing was held at Martin's request, and the hearing officer ruled the checkpoint was constitutionally valid and the result of Martin's chemical test was admissible. Martin appealed to the district court, which affirmed the hearing officer's decision and upheld the suspension of Martin's driving privileges.

## II

[¶ 5] Martin argues his stop at the checkpoint resulted in an unconstitutional seizure. The administrative agency's findings of fact are given great deference, and this Court will not make its own findings of fact or substitute its own judgment in place of the agency's. *Borowicz v. N.D. Dep't of Transp.*, 529 N.W.2d 186, 187 (N.D.1995). This Court's review is limited to ascertaining "whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Id.* (quoting *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979)). However, the "standard of review for a claimed violation of a constitutional right is de novo." *State v. Treis*, 1999 ND 136, ¶ 11, 597 N.W.2d 664.

[¶ 6] Police checkpoints are not per se unconstitutional under the Fourth Amendment of the United States Constitution or Article I, Section 8 of the North Dakota Constitution. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *State v. Everson*, 474 N.W.2d 695 (N.D.1991); and *City of Bismarck v. Uhden*, 513 N.W.2d 373 (N.D.1994). A checkpoint seizure is unconstitutional if it is unreasonable. *State v. Albaugh*, 1997 ND 229, ¶ 6, 571 N.W.2d 345. The reasonableness of a checkpoint stop is analyzed using a three-prong balancing test. *Sitz*, 496 U.S. at 448–49, 110 S.Ct. 2481; *Uhden*, 513 N.W.2d at 378. The three prongs to be weighed are "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

## A

[¶ 7] Martin concedes the State's interest in decreasing drunk driving is a valid public concern. Indeed, "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion." *Sitz*, 496 U.S. at 451, 110 S.Ct. 2481. The gravity of the public concern addressed by a checkpoint seizure is measured by the magnitude of the societal harm caused by a specific problem. *Everson*, 474 N.W.2d at 700–01.

[¶ 8] In *Everson*, we noted the societal harm caused by drug trafficking to be "one of the greatest problems affecting the health and welfare of our population." 474 N.W.2d at 701 (quoting *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). In *Albaugh*, we recognized the State's "compelling interest in managing and preserving its wildlife" and upheld a fish and game checkpoint intended to enforce the game laws of North Dakota. 1997 ND 229, ¶ 9, 571 N.W.2d 345. We also have recognized the societal harm caused by unsafe drivers and unsafe vehicles. *State v. Wetzel*, 456 N.W.2d 115, 120 (N.D.1990). In *Wetzel*, we upheld a traffic safety checkpoint and "recognized that 'States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence the licensing, registration, and vehicle inspection requirements are being observed.'" *Id.* at 118 (quoting *Delaware v. Prouse*, 440 U.S. 648, 658, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

[¶ 9] Based on evidence in the record and the magnitude of social harm caused by drunk driving, the hearing officer did

not err in finding the checkpoint addressed a substantial public concern.

## B

[¶ 10] Martin argues the checkpoint did not advance the public's interest in decreasing drunk driving because no public input was involved in planning the checkpoint. Martin's argument is unavailing. While public input in the planning stages of checkpoints may be useful and is encouraged, we have never required public input as a constitutional requirement for a valid checkpoint. *Uhden,* 513 N.W.2d at 378. In *Uhden,* we upheld a temporary sobriety checkpoint as constitutional under our three prong balancing test. *Id.* at 378–79. One of the facts of the *Uhden* checkpoint advancing the public's interest and, therefore, weighing in favor of constitutionality, was input from a citizens' advisory committee on the development of the checkpoint's operational guidelines. *Id.* at 378. While citizen input is encouraged in the planning of checkpoints and may be considered as a factor in determining the degree to which the checkpoint advances a public interest, such input remains only a factor and is not singularly determinative of constitutionality. *Id.*

[¶ 11] The second prong of the *Brown* test requires the courts to determine the degree to which the seizure advances the public interest. 443 U.S. at 50–51, 99 S.Ct. 2637. This prong is not meant to allow the judicial system to second-guess techniques used by law enforcement officials to achieve the State's interests. *Sitz,* 496 U.S. at 453, 110 S.Ct. 2481. The decision between reasonable alternative law enforcement techniques is to be left with politically accountable individuals "who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Id.* at 453–54, 110 S.Ct. 2481.

Rather, the degree to which a checkpoint advances the public interest calls for a searching examination of the checkpoint's effectiveness. *Id.* at 454, 110 S.Ct. 2481.

[¶ 12] An objective measure of a checkpoint's effectiveness is empirical data on the ratio of vehicles stopped to the number of arrests related to the purpose of the checkpoint. *Sitz,* 496 U.S. at 455, 110 S.Ct. 2481; *Everson,* 474 N.W.2d at 702–03. Although such data is not the only means of proving effectiveness, it can establish a checkpoint as constitutionally effective.

[¶ 13] When the United States Supreme Court entertained a challenge to a permanent immigration checkpoint in *United States v. Martinez–Fuerte,* the Court relied on empirical data to find the checkpoint effective. 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The purpose of the checkpoint in *Martinez–Fuerte* was to detect and apprehend illegal immigrants, and the Court found the checkpoint effective because 0.5 percent of the vehicles stopped at the checkpoint contained illegal immigrants. *Id.* The United States Supreme Court again relied on empirical data to determine a checkpoint's effectiveness in *Sitz.* 496 U.S. at 454–55, 110 S.Ct. 2481. The checkpoint in *Sitz* was intended to eradicate the problem of drunk driving, and the Court found the checkpoint effective because 1.6 percent of the drivers passing through the checkpoint were arrested for alcohol impairment. *Id.*

[¶ 14] North Dakota has followed suit, using empirical data of a checkpoint's success as indication of a checkpoint's effectiveness. The temporary checkpoint challenged in *Everson* was intended to combat the trafficking of drugs along North Dakota's highway system. 474 N.W.2d at 696. We concluded the *Everson* checkpoint was effective when only 0.196 percent of the drivers stopped at the checkpoint were

arrested for possession of controlled substances. *Id.* at 702–03.

[¶ 15] Here, it is unknown how many cars passed through the checkpoint and how many people, aside from Martin, were arrested for driving under the influence of alcohol. However, Martin's arresting officer testified that he was present at the checkpoint for half of its duration and that he detained only two vehicles for more than a minimal time. Without deciding the minimum success rate required for a checkpoint to be constitutionally effective, we recognize that more than 510 vehicles would need to have been stopped at this checkpoint to lower its success rate below the .196 percent success rate found effective in *Everson.* 474 N.W.2d at 702–03. While it appears unlikely the checkpoint stopped over 500 vehicles, we will not find a checkpoint effective based on speculation. "[T]he ratio of violations to total vehicles stopped is but one evidentiary means of assessing effectiveness," and when empirical data is lacking, alternative means are explored. *Albaugh,* 1997 ND 229, ¶ 12, 571 N.W.2d 345.

[¶ 16] A second possible measure of effectiveness is the checkpoint's value as a deterrent. *Albaugh,* 1997 ND 229, ¶ 12, 571 N.W.2d 345. A checkpoint's value as a deterrent is determined by comparing the checkpoint's purpose to its location and timing. *Id.* at ¶ 13. In *Albaugh,* we analyzed the effectiveness of a game and fish checkpoint by evaluating its value as a deterrent against game violations. *Id.* The *Albaugh* checkpoint was conducted during hunting season on a Sunday afternoon on a rural highway coming out of known hunting areas. *Id.* at ¶ 11. The location and timing of the checkpoint served to notify drivers who were stopped, as well as citizens who became aware of the checkpoint, that random game checks were being conducted and that any current

or future game law violations could be discovered by such a checkpoint. *Id.*

[¶ 17] Similar to the checkpoint in *Albaugh,* this checkpoint was designed to maximize its effectiveness. It was scheduled to coincide with Dickinson's Roughrider Days, an event that serves alcohol and draws many people to the area. The checkpoint was established on a heavily-traveled highway and was conducted in the late hours of the evening to coincide with the conclusion of the day's festivities. Based on the likelihood the checkpoint was statistically effective and on the effectiveness of the checkpoint in deterring drunk driving, we conclude the hearing officer did not err in finding the checkpoint effective.

### C

[¶ 18] The third prong of the *Brown* test requires measuring how severely the checkpoint interferes with individual motorists' liberties. 443 U.S. at 50–51, 99 S.Ct. 2637. Such a measurement requires gauging the objective and subjective levels of intrusion on individual motorists. *Sitz,* 496 U.S. at 452, 110 S.Ct. 2481.

### 1

[¶ 19] The objective level of a checkpoint's intrusion is "measured by the duration of the seizure and the intensity of the investigation." *Sitz,* 496 U.S. at 452, 110 S.Ct. 2481. The United States Supreme Court held the sobriety checkpoint in *Sitz* to be minimally intrusive based on the checkpoint's average delay of 25 seconds used to examine drivers for signs of intoxication. *Id.* at 447–48, 110 S.Ct. 2481. We have also held checkpoints to be minimally invasive when law-abiding motorists are only briefly detained for questioning or inspection. *Everson,* 474 N.W.2d at 702. In *Everson,* we held a temporary checkpoint seeking controlled substances to be

minimally intrusive when motorists were stopped and briefly questioned by an officer when there were no safety violations and where no suspicions were aroused. *Id.* Our analysis was similar in *Albaugh,* where we concluded a temporary game and fish checkpoint was minimally intrusive because stopped motorists were only briefly detained unless a game law violation was detected. 1997 ND 229, ¶ 14, 571 N.W.2d 345.

[¶ 20] Martin does not argue the checkpoint was intrusive from an objective standpoint. This checkpoint only slightly intruded on the liberties of motorists, because officers advised drivers of the reason for the stop, did not routinely request drivers licenses, registration cards, or insurance information and did not enforce minor traffic violations. Law-abiding motorists were stopped anywhere from 30 to 60 seconds before being released. The level of objective intrusion caused by this checkpoint was slight.

2

[¶ 21] The subjective level of a checkpoint's intrusion is measured by "the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Sitz,* 496 U.S. at 452, 110 S.Ct. 2481. Many factors are analyzed to determine a checkpoint's subjective level of intrusion, one of which is the "amount of discretion given individual officers in conducting the checkpoint." *Albaugh,* 1997 ND 229, ¶ 16, 571 N.W.2d 345. "A 'central concern' in balancing the competing societal interests is 'to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.'" *Id.* (quoting *Brown,* 443 U.S. at 51, 99 S.Ct. 2637).

[¶ 22] Martin argues the checkpoint was constitutionally defective because checkpoint officers had unbridled discretion over which vehicles to stop. Martin's argument is based on the checkpoint's operational order, which indicated all vehicles traveling eastbound through the checkpoint would be stopped unless otherwise directed by the checkpoint supervisor. The operational order further outlined that the checkpoint supervisor could shut down the checkpoint if necessitated by safety or congestion concerns. Testimony at trial supported the reasonable interpretation of the operational order to mean that every vehicle was to be stopped unless doing so would cause safety concerns or unjustifiable traffic congestion. Indeed, during the portion of the checkpoint's screening about which we have evidence, every eastbound vehicle was stopped at the checkpoint.

[¶ 23] The amount of discretion here is similar to that in *State v. Wetzel,* 456 N.W.2d 115 (N.D.1990). In *Wetzel,* a temporary checkpoint was established to perform vehicle safety inspections. *Id.* at 116. Pursuant to the operational order, checkpoint officers stopped and inspected a vehicle and then "stop[ped] the next available vehicle when safe." *Id.* at 120. We held when a checkpoint policy established a systematic procedure for stopping vehicles at a fixed checkpoint, the qualification of the policy with a safety clause does not grant the checkpoint officers unbridled discretion. *Id.* In *Wetzel,* as here, the checkpoint stop "wasn't merely an act of unbridled whim, but was a part of a calculated pattern established for inspecting vehicles at a fixed checkpoint." *Id.* at 121. This indicates the subjective level of intrusion caused by this checkpoint was minimal.

[¶ 24] Another factor affecting a checkpoint's subjective level of intrusion is the checkpoint's visibility. *Uhden,* 513 N.W.2d at 378–79. A checkpoint's visibility concerns a motorist's ability to recognize the existence and legal authority of a

checkpoint and a motorist's ability to avoid a checkpoint. A checkpoint visible from a great distance is less intrusive than one hidden from view because approaching motorists are given time to recognize the checkpoint by seeing other cars being stopped or by seeing clear displays of law enforcement's presence and authority. *Id.*; *United States v. Ortiz,* 422 U.S. 891, 894–95, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

[¶ 25] When law-abiding motorists see visible indications of police authority, such as signs, cones and other safety devices, the motorists' level of fear and surprise is diminished. *Ortiz,* 422 U.S. at 894–95, 95 S.Ct. 2585; *Uhden,* 513 N.W.2d at 378. Such displays reduce a checkpoint's subjective level of intrusion. *See, e.g., Ortiz,* at 893, 95 S.Ct. 2585 (permanent immigration checkpoint where flashing signs, traffic cones, fully uniformed officers and patrol vehicles with flashing lights demonstrated legal authority); *Uhden,* 513 N.W.2d at 378 (temporary sobriety checkpoint where signs, flares, traffic cones and other safety devices demonstrated legal authority); *Albaugh,* 1997 ND 229, ¶ 2, 571 N.W.2d 345 (temporary game and fish checkpoint where signs, law enforcement vehicles with top red lights and traffic cones demonstrated legal authority).

[¶ 26] Another attribute of checkpoints visible from a distance is the potential for motorists to avoid the checkpoint. *State v. Hahne,* 2007 ND 116, ¶ 14, 736 N.W.2d 483. A checkpoint that cannot be avoided is not unconstitutional per se, but the inability to avoid a checkpoint is another factor increasing a checkpoint's subjective level of intrusion. *Id.* at ¶ 13. In *Hahne,* a motorist challenged a checkpoint as unconstitutional because there was no way to safely avoid the checkpoint. *Id.* at ¶ 14. Upholding the checkpoint as constitutional, we held, "[L]aw enforce-

ment checkpoints need not, as a matter of law, provide motorists with a way to avoid them. When considering the constitutional reasonableness of a checkpoint, avoidability is one factor that may be considered in evaluating the intrusion on the personal liberty of individual motorists." *Id.* at ¶ 15.

[¶ 27] Martin argues the checkpoint's level of subjective intrusion was unconstitutional because no opportunity to safely avoid the checkpoint existed. At trial, Martin asserted there were no intersections between the checkpoint warning signs and the checkpoint, leaving approaching motorists with no safe alternative to passing through the checkpoint. Martin's testimony was directly contradicted by a checkpoint officer who indicated intersections between the checkpoint warning signs and the checkpoint were accessible, allowing safe methods to avoid the checkpoint. While we note the conflicting evidence and shortcomings of both witnesses' testimony, the hearing officer did not decide and, it is not necessary for us to decide, whether the checkpoint was avoidable. As we have stated, avoidability is only one factor used to determine a checkpoint's subjective level of intrusion and a checkpoint that is unavoidable is not unconstitutional per se. *Hahne,* 2007 ND 116, ¶ 15, 736 N.W.2d 483.

[¶ 28] The record reflects the checkpoint was conducted pursuant to its operational order. The operational order required checkpoint officers to wear department issued safety vests and to display signs and safety cones. Law enforcement vehicles also were located on the scene of the checkpoint. Martin does not argue the checkpoint caused him fear and surprise; he only argues the checkpoint was unavoidable.

[¶ 29] We conclude this checkpoint's level of subjective intrusion was slight.

While it was debatable whether approaching motorists had an opportunity to avoid the checkpoint, the checkpoint officers had little discretion in which vehicles to stop and the checkpoint was amply visible to notify approaching motorists of its existence and legal authority.

[¶ 30] The constitutionality of a checkpoint is based on the reasonableness of the checkpoint's seizures. *Albaugh*, 1997 ND 229, ¶ 6, 571 N.W.2d 345. The reasonableness of a checkpoint seizure is determined by balancing three prongs: "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown*, 443 U.S. at 50–51, 99 S.Ct. 2637. The weight to be given each prong is based on its underlying facts, and the underlying facts are viewed within the totality of the circumstances.

[¶ 31] Here, the stop of Martin at the checkpoint was reasonable and the checkpoint was constitutional. We have long recognized the State's great interest in reducing drunk driving, and the checkpoint proved effective in furthering this interest by removing at least one impaired driver from the road and by making many more drivers aware of the problem. The record also reflects the level of intrusion caused by the checkpoint was objectively and subjectively minimal. Law-abiding motorists were briefly detained at the checkpoint and were not subjected to undue fear or surprise because the checkpoint officer's had minimal discretion in which vehicles to stop and because the checkpoint demonstrated visible signs of legal authority. The hearing officer did not err in finding the checkpoint constitutional.

### III

[¶ 32] Martin argues the results of his chemical tests should not have been admitted into evidence because the administering officer failed to follow the approved methods for conducting the tests. Martin claims pieces of chewing tobacco were stuck to his teeth during administration of both the S–D2 and the Intoxilyzer breath tests. Martin asserts the presence of the tobacco in his mouth violates the approved method of conducting breath tests because the approved method requires the administering officer to ascertain whether the subject has had anything to eat, drink or smoke for a requisite period of time before each test.

[¶ 33] This Court must affirm an agency's order unless any of the following are present:

"1. The order is not in accordance with the law.

"2. The order is in violation of the constitutional rights of the appellant.

"3. The provisions of this chapter have not been complied with in the proceedings before the agency.

"4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

"5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

"6. The conclusions of law and order of the agency are not supported by its findings of fact.

"7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

"8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge."

N.D.C.C. § 28–32–46(1–8). The administrative agency's findings of fact are given

great deference, and this Court will not make its own findings of fact nor substitute its own judgment in place of the agency's. *Borowicz v. N.D. Dep't of Transp.,* 529 N.W.2d 186, 187 (N.D.1995). This Court's review is limited to ascertaining "whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Id.* (quoting *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979)).

[¶ 34] When the State seeks to use chemical tests to prove allegations of drunk driving,

> "[t]he results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to the methods and with devices approved by the director of the state crime laboratory or the director's designee, and by an individual possessing a certificate of qualification to administer the test issued by the director of the state crime laboratory or the director's designee."

N.D.C.C. § 39–20–07(5).

[¶ 35] For a chemical test to be considered fairly administered, proof must exist that the individuals conducting the tests scrupulously followed the director's instructions. *City of West Fargo v. Hawkins,* 2000 ND 168, ¶ 16, 616 N.W.2d 856. "However, 'scrupulous' compliance does not mean 'hypertechnical' compliance." *Id.* (citing *McPeak v. Moore,* 545 N.W.2d 761, 764 (N.D.1996)). The approved method of operation for the S–D2 breath test requires the administering officer to "[a]scertain that the subject has nothing to eat, drink, or smoke within three minutes prior to the subject providing a breath sample." *Approved Method for Operating the Intoxilyzer S–D2,* July 1, 2006. The approved

method of operation for the Intoxilyzer breath test requires the administering officer to "ascertain that the subject has had nothing to eat, drink, or smoke within twenty minutes prior to the collection of the breath sample." *Approved Method to Conduct Breath Tests with the Intoxilyzer 5000 KB–EP,* July 1, 2006.

[¶ 36] Prior to administering the S–D2 breath test to Martin, the arresting officer had Martin spit out his chewing tobacco. The officer then visually inspected Martin's mouth to confirm Martin's statement that his mouth was empty, and he observed Martin for three minutes. Prior to administering the Intoxilyzer breath test to Martin, the same officer visually inspected Martin's mouth to confirm Martin's renewed statement that his mouth was empty. The arresting officer observed Martin for more than twenty minutes before the Intoxilyzer test was administered.

[¶ 37] "[T]he State Toxicologist's approved method does not require test operators to ask subjects if they have anything in their mouths or to check their mouths prior to administering the test. Although test operators are encouraged to take such precautions, the approved method imposes no such requirements, and we decline to amend it by holding that it does." *Buchholz v. N.D. Dep't of Transp.,* 2002 ND 23, ¶ 12, 639 N.W.2d 490. The approved method requires "an operator's observation that a subject did not eat, drink, or smoke in the twenty minutes prior to the test." *Id.* at ¶ 11. Based on the evidence, the officer who administered Martin's breath tests not only met, but also exceeded the approved methods of administering breath tests. A reasoning mind could reasonably conclude that Martin's breath tests were administered according to the approved method and that the hearing offi-

cer did not err by admitting the results into evidence.

## IV

[¶ 38]   We conclude Martin's seizure at the checkpoint was reasonable and the checkpoint was constitutional.   We also conclude the hearing officer did not err by admitting the results of Martin's chemical tests into evidence.   The district court judgment upholding the suspension of Martin's driving privileges for 91 days is affirmed.

[¶ 39] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.